BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
MICHAEL J. MORSE (Cal. Bar No. 291763)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
1400/1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3667/3535/0813
Facsimile: (213) 894-0142
E-mail: ian.yanniello@usdoj.gov
michael.morse@usdoj.gov
daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEANDRE WILSON,

Defendant.

No. CR 24-621(D)-MWF-2

GOVERNMENT'S OPPOSITION TO DEFENDANT DEANDRE WILSON'S EX PARTE APPLICATION FOR AN ORDER DIRECTING THE GOVERNMENT TO CORRECT FALSE TESTIMONY AND FOR AN ADVERSE JURY INSTRUCTION FOR NAPUE AND BRADY VIOLATIONS; EXHIBIT 1

Plaintiff United States of America, by and through its counsel of record, hereby files its Opposition to defendant Deandre Wilson's Ex Parte Application alleging Napue and Brady Violations.

//

//

This Opposition is based upon the attached memorandum of points and authorities, the attached Exhibit 1, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 30, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

/s/
IAN V. YANNIELLO
MICHAEL J. MORSE
DANIEL H. WEINER

Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION PAGE

TABLE OF AUTHORITIES....ii

MEMORANDUM OF POINTS AND AUTHORITIES....1

I. Introduction....1

II. There Was No Brady Violation Regarding Exhibit 164....2

A. Background Facts....2

1. Pre-trial Litigation Regarding the Exhibit....2

2. The Exhibit is Introduced at Trial....5

B. Legal Standard....7

C. Defendant's Assertions Fail All Three Brady Prongs....7

1. The Publicly Available YouTube Version of Exhibit 164 Is Not Exculpatory or Helpful to the Defense....7

2. Even if the Publicly Available YouTube Video Was Exculpatory or Impeaching, the Government Did Not Suppress the Evidence....9

3. Defendant Suffered No Prejudice....13

III. There Was No Napue Violation During PW-1's Testimony....15

A. Factual Background....15

B. Legal Standard....16

C. Defendant Has Failed to Satisfy Any Prerequisite for a Napue Claim, Much Less All Three....18

IV. Conclusion....19

# TABLE OF AUTHORITIES

DESCRIPTION PAGE(S)

Cases:

Comstock v. Humphries,
786 F.3d 701 (9th Cir. 2015) .................................. 8
Cunningham v. Wong,
704 F.3d 1143 (9th Cir. 2013) .................................. 11
Hampton v. Shinn,
143 F.4th 1047 (9th Cir. 2025) .................................. 17
Hayes v. Brown,
399 F.3d 972 (9th Cir. 2005) .................................. 17
Hein v. Sullivan,
601 F.3d 897 (9th Cir. 2010) .................................. 16
Jones v. Ryan,
733 F.3d 825 (9th Cir. 2013) .................................. 11
Milke v. Ryan,
711 F.3d 998 (9th Cir. 2013) .................................. 11
Morris v. Ylst,
447 F.3d 735 (9th Cir. 2006) .................................. 12
Panah v. Chappell,
935 F.3d 657 (9th Cir. 2019) .................................. 16, 17
Pickens v. Gonzalez,
2010 WL 128341 (C.D. Cal. Jan. 8, 2010) .................................. 12
Raley v. Ylst,
470 F.3d 792 (9th Cir. 2006) .................................. 10, 11
Sivak v. Hardison,
658 F.3d 898 (9th Cir. 2011) .................................. 17, 18
Stinchfield v. Ndoh,
No. CV 16-4253-PJW, 2017 WL 3484853 (C.D. Cal. Aug. 14, 2017) .... 12
Strickler v. Greene,
527 U.S. 263 (1999) .................................. 7
United States v. Aichele,
941 F.2d 761 (9th Cir. 1991) .................................. 9, 11, 14
United States v. Bundy,
968 F.3d 1019, 1033 (9th Cir. 2020)
United States v. Bond,
552 F.3d 1092 (9th Cir. 2009) .................................. 11
United States v. Cloud,
102 F.4th 968 (9th Cir. 2024) .................................. 9, 13
United States v. Dupuy,
760 F.2d 1492 (9th Cir. 1985) .................................. 9
United States v. Fujinaga,
2022 WL 671018 (9th Cir. Mar. 7, 2022) .................................. 16
United States v. Gordon,
844 F.2d 1397 (9th Cir. 1988) .................................. 13
United States v. Howell,
231 F.3d 615 (9th Cir. 2000) .................................. 15

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION PAGE(S)

United States v. Houston,
648 F.3d 806 (9th Cir. 2011) .... 14
United States v. Juvenile Male,
864 F.2d 641 (9th Cir. 1988) .... 14
United States v. Lester,
557 F. App'x 788 (10th Cir. 2014) .... 12
United States v. Lochmondy,
890 F.2d 817 (6th Cir. 1989) .... 17
United States v. Lynch,
903 F.3d 1061 (9th Cir. 2018) .... 7
United States v. Payne,
63 F.3d 1200 (2d Cir. 1995) .... 12
United States v. Renzi,
769 F.3d 731 (9th Cir. 2014) .... 16, 18
United States v. Ruiz,
No. SACR 11-209-JST, 2013 WL 12219379 (C.D. Cal. Jan. 8, 2013) .... 12
United States v. Shelton,
588 F.2d 1242 (9th Cir. 1978) .... 14
United States v. Span,
970 F.2d 573 (9th Cir. 1992) .... 14
United States v. Willis,
277 F.3d 1026 (8th Cir. 2002) .... 11
United States v. Zuno-Arce,
339 F.3d 886 (9th Cir. 2003) .... 16

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. Introduction

Following a multi-week jury trial, defendant Wilson was convicted of conspiring to stalk Tyquian Bowman, stalking Bowman with a dangerous weapon, and stalking S.R. resulting in S.R.'s death. During trial, defendant Wilson filed an application asserting: (1) a Brady violation based on the government's disclosure of a publicly available YouTube version of Exhibit 164 that contained users posting comments that were visible to defendant when he made the Instagram live video; and (2) Napue violations based on purportedly false testimony PW-1 gave when defense counsel questioned PW-1 about prior statements PW-1 made to the FBI. As the Court has already determined in its tentative ruling, defendant's claims are meritless and should be rejected.

Defendant's Brady claim fails for multiple reasons. First, contrary to defendant's claim, the user comments contained in the public YouTube video are not helpful to the defense; they are inculpatory. Indeed, if the Court credits defendant's interpretation of what defendant stated in the video --- "Dede *and Murdaman*, for sure that" --- the comments show that defendant made that statement at the time a user commented, "Money make them killers pop outside", thereby showing defendant's adoption just a month after S.R.'s murder that money made him "pop outside" to kill. In any event, the government produced the public YouTube version of Exhibit 164 with ample time for defendant to use the evidence at trial, and defense counsel declined to do so --- affirming its lack of materiality. These facts, coupled with the Court's prophylactic decision to strike

the exhibit, further compel a ruling that no Brady violation occurred.

Defendant's Napue argument should similarly be denied because defendant has not met his burden to establish any element of such a violation, including "actual falsity." The claim also independently fails because defendant cannot establish the testimony at issue was material given significant evidence presented at trial establishing defendant's guilt, including (i) evidence and testimony showing defendant recruited two of the shooters and traveled with them to California on August 18, 2022 to stalk and kill Bowman; testimony, surveillance video, and cell tower data showing that defendant and other co-conspirators stalked Bowman from the night of August 18 until co-conspirators ambushed Bowman's vehicle around 5:30 p.m. on August 19, striking and killing S.R.; (iii) testimony and evidence showing defendant coordinated return flights for all co-conspirators shortly after S.R.'s murder; and (iv) evidence showing defendant and other OTF members celebrated and mocked S.R.'s death, among other evidence.

The Court should deny defendant's motion in full.

## II. There Was No Brady Violation Regarding Exhibit 164

### A. Background Facts

#### 1. Pre-trial Litigation Regarding the Exhibit

Government's trial Exhibit 164 was a video seized from defendant's Instagram account depicting him walking through an area in the South Side of Chicago claimed by the "Tay Town" gang, a faction of Black Disciples of which he was a gang leader.

On July 27, 2026, defendant Wilson moved to exclude the video under Rules 404(b) and 403. (Dkt. 488 at 9 [under seal].) In its

opposition, the government argued that defendant admits during the video --- which was filmed approximately one month after the Los Angeles murder --- to his participation in S.R.'s murder, stating: "They talking about DeDe [Wilson being] a murder man," "for sure that." (Dkt. 535 at 7-8 [under seal].) The video shows defendant walking through "Tay Town," and stating "pull up – all gang members tap in, we out here. All gang members, opps, pop up ... just come out." Later, defendant states "why they ain't send they lo[cation]...this far from cancer we give out free smoke."

Based on the foregoing, the government argued that defendant's self-proclaimed description as "a murder man" (approximately one month after the murder of S.R.) was probative to consciousness of guilt. The government further argued that defendant's admissions were relevant and material to prove his gang relationship with other co-conspirators, and were consistent with expected cooperator testimony and other evidence that the stalking of Tyquian Bowman and S.R. was precipitated by defendant Banks, defendant Wilson, and others obtaining Tyquian Bowman's "lo[cation]." (Id.)

During the August 18, 2026 pretrial conference, the parties litigated the admissibility of Exhibit 164. Defense counsel argued that the government had not met its burden to establish the exhibit was relevant or that it satisfied Rule 404(b). (8/18/26 RT at 62-63.) Defense counsel acknowledged the exhibit was "an Instagram live video where Mr. Wilson is referring to comments." (Id.) Defense counsel disputed the government's interpretation that defendant stated he was a "murder man," but did not flag for the Court

defendant's alternative interpretation that defendant now asserts he said, namely, "Dede *and* Murdaman, for sure that."[1]

In response, the government stated the following:

> With respect to [Exhibit] 164, [defense counsel] is free to make arguments that it -- that what Mr. Wilson said in plain language didn't relate to the murder that had occurred just a few weeks before. 100 percent, the Government believes it did. He doesn't have to be the one who pulled the trigger to be the one who helped recruit the triggerman, to be the one who helped facilitate the murder. So our position is he took credit for killing [S.R.], and the jury has to right to evaluate that evidence.

(8/18/26 RT at 64-65.) On August 19, 2026, the government became aware of a publicly-available video on YouTube appearing to contain the Instagram video depicted in Exhibit 164, with additional scrolling commentary on the bottom --- the comments defense counsel referred to during the August 18 hearing described above.[2] At the time, the government did not understand or appreciate defendant's alternative interpretation of his statement (i.e., "Dede *and* Murdaman, for sure that", as opposed to "Dede *a* murder man, for sure that"), nor that there was a scrolling comment in the above-mentioned YouTube video referencing "Dede" and "Murdaman." (9/4/26 RT at 83.)

---

[1] The Court specifically inquired to defense counsel, "are you saying that they are … misinterpreting what is being said in the video?". (8/18/26 RT at 63.) Defense counsel responded, ""Absolutely, Your Honor. It's an inaccurate assertion."

[2] See Ex. 1; see also "otf dede goes live taunting the opps after they fail to pull up on him #chicago #fyp #subscribe", available at https://www.youtube.com/watch?v=bGA5T1_xXDE. Notably, the video is the second result after searching the following terms: "otf dede instagram", or "otf dede ig [instagram] live". The video is also in the top five results when the term "dede instagram" is queried.

2. The Exhibit is Introduced at Trial

On August 24, 2026, during the testimony of LAPD Det. Carias, the government moved to admit Exhibit 164. (8/24/26 RT at 171.) Det. Carias testified that he obtained a search warrant for defendant Wilson's Instagram account and seized the video (Exhibit 164) because it was relevant to his investigation. The government also moved to admit Exhibit 164-A, which was the metadata from the video, showing that it was filmed approximately one month after S.R.'s murder. (Id.) Defense counsel did not object to the exhibits' admission, nor did he cross examine Det. Carias regarding the exhibits.

On August 26, 2026, during the testimony of cooperating witness PW-1, the government played Exhibit 164. Prior to playing the video, PW-1 testified that he recognized the video, that it depicted defendant in the "Tay Town" area in the South Side of Chicago, and that defendant was wearing a sweatshirt that said "Tay Town." (8/26/26 RT at 200.) The Court then gave the jury a limiting instruction regarding the video, specifically that it was only admissible against defendant. (Id.)

After playing the video for the jury --- which did not have an accompanying transcript --- PW-1 testified that he recognized other Black Disciple members in the video, that defendant Wilson was a leader in the Tay Town gang, and that the term "send that lo" was a reference to the "opps" to "tell us where you at." (8/26/26 RT at 202-203.) Again, defense counsel for defendant Wilson did not object when the video was played during PW-1's direct examination or to any of the follow up questions or testimony regarding the video on direct; he also elected not to cross PW-1 about the exhibit.

Later that afternoon, defense counsel moved for a mistrial based on the government's purported misrepresentation during the August 18 pretrial conference regarding its interpretation of the video. (8/26/26 RT at 314-315.) Specifically, defense counsel argued, for the first time, that defendant Wilson was referring to "an individual, Murda" "who was present in the video." (8/26/26 RT at 315-316.) Defense counsel claimed the government purportedly "knew" defendant Wilson was referring to "Murda" because FBI interview notes the government produced reflected that multiple gang associates were present at various times in Exhibit 164, including someone named "Murdaman."[3] In response, the government explained "the exhibit speaks for itself" and maintained its position that defendant stated, "They are saying Dede is a murder man, for sure that." (8/26/26 RT at 315-316.) The government noted that defense counsel could cross-examine witnesses and/or argue that defendant Wilson was referring to someone else. (Id.) Defense counsel confirmed he would do so, stating "we will be providing a transcript, unlike the Government, and we will be addressing it with their witness." (Id. at 316.) The Court denied defendant's request for a mistrial, noting "I don't think that there is any unduly prejudicial effect here on Mr. Wilson" and "certainly it's not excludable under Rule 403." (Id. at 316-317.)

On September 3, 2026, defendant filed this motion. The following day, prior to closing arguments, the Court heard oral argument on defendant's motion, in part to determine whether an adverse jury instruction was warranted for defendant's Brady and

[3] The interview notes were from a brief interview of PW-1 that occurred earlier that morning (August 26, 2026). Following the interview, the government immediately produced notes from the interview to defense counsel. (See Mot., Ex. C.)

Napue claims. The Court provided its tentative ruling on the motion, denying both on the merits, and denying the request for an adverse jury instruction. (8/26/26 RT at 92-94, 99.)

Given the competing versions of the interpretation regarding defendant's admission in Exhibit 164, the government proposed either striking the exhibit, or admitting the YouTube version with the scrolling comments. (Id. at 94.) Defense counsel asked that the exhibit be struck, to which the Court agreed. (Id.) The Court then struck the exhibit and ordered that it not be sent back to the jury room during deliberation,[4] but at defendant's request did not orally inform the jury the exhibit had been struck. (9/8/26 RT at 3-4.)

**B. Legal Standard**

"There are three components of a true Brady violation": (1) the "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the "evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

**C. Defendant's Assertions Fail All Three Brady Prongs**

Defendant fails to meet any element of a Brady violation, let alone all three.

1. The Publicly Available YouTube Version of Exhibit 164 Is Not Exculpatory or Helpful to the Defense

Defendant fails to show that the running comments on the YouTube version of Exhibit 164 were favorable to the defense and/or exculpatory, a required element of a Brady claim. See United States

[4] Neither Exhibit 164 nor the video's metadata (Exhibit 164-A) were provided to the jury during deliberations.

v. Lynch, 903 F.3d 1061, 1074 (9th Cir. 2018) (no Brady violation where information was "not exculpatory"). "[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable." Comstock v. Humphries, 786 F.3d 701, 708 (9th Cir. 2015).

Here, defendant claims that because the publicly available YouTube version of Exhibit 164 contains a user comment stating "Dede and murdaman," the running comments are favorable to the defense. Not so, as the argument ignores the full context of the disputed statement defendant made during the video. Specifically, if defendant stated "Dede *and* Murdaman" as he now claims, then the YouTube video shows defendant stated "They talking about Dede and Murdaman, for sure that" in response to a comment posted by a user stating, "Money make them killers pop outside":



(Ex. 1 at 1:17.) Thus, even if defendant's interpretation is credited, the public YouTube version of Exhibit 164 creates a more culpable inference than had defendant merely stated "Dede a murder man" because it shows defendant embraced the comment that he and "Murdaman" were "killers" that would "pop outside" (i.e., kill) for money. Moreover, any claim that the running commentary would have had impeachment value fails because the government elicited no testimony, showed no transcript, nor made any argument to the jury that defendant said, "Dede a murder man."

Accordingly, had the Court not resolved the issue by striking Exhibit 164, the jury as the factfinder could have reasonably concluded that defendant admitted his role in S.R.'s murder based on the government's interpretation of what defendant said or defendant's alternative interpretation.[5]

2. Even if the Publicly Available YouTube Video Was Exculpatory or Impeaching, the Government Did Not Suppress the Evidence

Evidence is "suppressed" when it is known to the government but not disclosed to the defendant. United States v. Cloud, 102 F.4th 968, 976 (9th Cir. 2024). When "a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government." United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991); United States v. Dupuy, 760 F.2d 1492, 1502 (9th Cir. 1985) (cleaned up) ("government is not required to

---

[5] Additionally, as the Court made clear, it would have admitted the video even if the "murder man" comment was not a direct admission of defendant's involvement in S.R.'s murder, as the video was independently "admissible to show Mr. Wilson's affiliation with OTF/Black Disciples, and who he felt he was on the south side [of Chicago]." (9/4/26 RT at 93:14-20.)

make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish").

Here, there was no Brady "suppression" for multiple reasons. First, defendant had all the "salient facts regarding the existence of the [evidence] that he claims" was suppressed. Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006). Specifically, during the August 18, 2026 pretrial conference when the parties litigated the admissibility of Exhibit 164, defense counsel confirmed he knew Exhibit 164 was a video depicting defendant on his own "Instagram live video where Mr. Wilson is referring to comments."[6] (8/18/26 RT 62:12-16). At the time, defense counsel "was aware of Mr. Wilson's alternative explanation" but later told the Court that "it was not his burden to share that with the Court or the Government, and that it was [the government's] burden to introduce his alternative explanation." (9/4/26 RT 87:2-5.) Because defendant himself "knew of the existence" of the alternative explanation (i.e., what defense counsel represented was the actual statement defendant made, namely, "Dede and Murdaman"), defense counsel could have raised the issue (1) at multiple times before trial, (2) during Det. Carias's testimony on August 24, 2026 (when Exhibit 164 was introduced but not played for the jury), or (3) during PW-1's testimony (when the exhibit was

[6] Exhibit 164 was obtained pursuant to a search warrant related to defendant's Instagram account. The publicly available YouTube version of the exhibit (which was recorded by a user who watched defendant's Instagram "live" video), was not included in the production from Instagram.

played for the jury without testimony regarding the meaning of defendant's statement at issue).

Defense counsel's awareness of the salient facts surrounding the publicly available YouTube video, including defendant's understanding at least by the time the exhibit was shown to the jury that "Murdaman" was another gang member present in Exhibit 164, supports a finding that there was no Brady suppression on behalf of the government. See Raley, 470 F.3d at 804 (holding that there was no Brady suppression where "Petitioner knew that he had made frequent visits to medical personnel at the jail [and] knew that he was taking medication that they prescribed for him," which were "facts were sufficient to alert defense counsel to the probability that the jail had created medical records relating to Petitioner."); see also United States v. Bond, 552 F.3d 1092, 1095-96 (9th Cir. 2009) (no Brady suppression if the "defendant has enough information to be able to ascertain the supposed Brady material on his own," and "there was no government action to throw the defendant off the path of the alleged Brady information").

Second, there was no government suppression because defendant had "equal access" to the publicly-available YouTube version of Exhibit 164, Jones v. Ryan, 733 F.3d 825, 838 (9th Cir. 2013), which was "easily attainable evidence" on the internet, Cunningham v. Wong, 704 F.3d 1143, 1154 (9th Cir. 2013). While mere presence of evidence in the public record does not defeat a Brady suppression claim in and of itself, see Milke v. Ryan, 711 F.3d 998, 1017 (9th Cir. 2013), defendant had more than "enough information to be able to ascertain the supposed Brady material on his own," Aichele, 941 F.2d at 764; see United States v. Willis, 277 F.3d 1026, 1034 (8th Cir. 2002)

("Publicly available information which the defendant could have discovered through reasonable diligence cannot be the basis for a Brady violation."); United States v. Lester, 557 F. App'x 788, 791 (10th Cir. 2014) (holding that "no Brady violation could be established because, *inter alia*, the information identified by Mr. Lester is readily available to the public, as evidenced by Mr. Lester's Google search, and therefore was in no way "withheld" by the government).[7]

In sum, defense counsel chose to not present his client's interpretation of Exhibit 164 both during the August 18 pretrial conference and during trial. The government produced the publicly available YouTube video to defendant with sufficient time for defense counsel to make use of the evidence should he choose to do so. Defense counsel's tactical decision to not cross-examine or seek admission of the public comments --- including the comment "money make them killers pop outside" --- does not turn the government's good faith interpretation and introduction of inculpatory evidence into error, let alone a constitutional one. See, e.g., Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006) ("the animating purpose of Brady is to preserve the fairness of criminal trials.... The Brady rule is not meant to displace the adversary system ....").

[7] See also Stinchfield v. Ndoh, No. CV 16-4253-PJW, 2017 WL 3484853, at *4 (C.D. Cal. Aug. 14, 2017) (no Brady violation occurred when alleged impeachment evidence was either known by defense counsel or publicly available for counsel to obtain); Pickens v. Gonzalez, EDCV 08-1362-CAS (DTB), 2010 WL 128341, at *5 (C.D. Cal. Jan. 8, 2010) (no Brady violation occurred when evidence was publicly available); United States v. Ruiz, No. SACR 11-209-JST, 2013 WL 12219379, at *1 (C.D. Cal. Jan. 8, 2013) ("weight of authority holds that information is not 'suppressed' " for purposes of Brady "if it is publicly available" (citing United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995)).

Accordingly, there was no government suppression within the meaning of Brady regarding the publicly available YouTube video.

3. Defendant Suffered No Prejudice

Finally, defendant fails to meet his burden to show he suffered any prejudice from the introduction (and subsequent striking) of Exhibit 164. When a Brady claim is raised during or before trial, the prejudice or "materiality" inquiry asks whether "the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." Cloud, 102 F.4th at 979; United States v. Bundy, 968 F.3d 1019, 1033 (9th Cir. 2020). "The materiality inquiry should evaluate the relative value of the withheld evidence on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." Cloud, 102 F.4th at 979 (cleaned up). But Brady does not "require that the prosecution turn over exculpatory material before trial" at all, so long as the information is "disclosed to the defendant[]" while "still of substantial value **at trial**." United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir. 1988) (emphasis added). As long as it remains possible for the defense to use the information at trial, there is no Brady violation and exclusion is inappropriate.

Here, defendant suffered no prejudice because he knew of the comments and made a tactical decision to not present his alternative explanation during cross-examination of PW-1 or any other government witness. The government provided defense counsel with a hyperlink to the publicly-available YouTube video on the same day that Exhibit 164 was published during PW-1's direct examination. As noted above, PW-1 --- nor any government witness --- provided testimony about the

meaning of defendant's "murder man" comment. Thus, if defense counsel believed the Instagram comments were helpful to the defense, he had ample time to use the evidence during the multi-week trial. Accordingly, because defense counsel had a "substantial opportunity to use [the] information at trial," that "opportunity" "cures any prejudice caused by delayed disclosure." Aichele, 941 F.2d at 765 (even when a Brady disclosure is "incomplete and untimely," there is no violation when the defendant has a "substantial opportunity to use [the] information at trial") (citing Gordon, 844 F.2d at 1403).

Additional Ninth Circuit authority also compel this outcome. In United States v. Houston, for example, the Ninth Circuit found no Brady violation when information was disclosed "while cross-examination was ongoing." 648 F.3d 806, 813 (9th Cir. 2011). In that case, like here, the information "still had evidentiary value to the defense because [it] could be used -- and [was] used -- during cross examination." Id. And in United States v. Span, 970 F.2d 573, 583 (9th Cir. 1992), the Ninth Circuit found no Brady violation when the information was disclosed after cross-examination, because the district court "gave defense counsel the opportunity to recall" the witness "for further cross-examination." Id.; see also United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) (no Brady violation when evidence "came out during the trial," after the cross-examination of the relevant witness).[8]

Given defense counsel's ability to cross-examine PW-1 or other government witnesses about his "Murdaman" theory, coupled with the

---

[8] See also United States v. Shelton, 588 F.2d 1242, 1247 (9th Cir. 1978) (no Brady violation for untimely disclosure because while "no continuance was offered, there was a five day delay after the second day of trial").

significant evidence presented at trial establishing defendant's guilt and the Court's prophylactic decision to strike Exhibit 164, defendant has not established prejudice under Brady. See United States v. Howell, 231 F.3d 615, 627 (9th Cir. 2000) (finding no prejudice where the defendant was able to effectively cross-examine witnesses about the evidence the prosecutor disclosed only during trial and there was significant other evidence of the defendant's guilt).

## III. There Was No Napue Violation During PW-1's Testimony

### A. Factual Background

During cross examination, defendant Wilson's counsel attempted to impeach PW-1 by citing to law enforcement reports (i.e., FBI 302s) that were not written or adopted by PW-1. Notably, defense counsel did not attempt to show PW-1 the reports he was referencing; he did not attempt to call the FBI agents who authored the reports or who were present for the interviews; and he did not question FBI witnesses the government subsequently called during trial about PW-1's statements. Instead, defendant filed the current motion claiming the following three statements by PW-1 amount to Napue violations:

(1) PW-1 testified that he never told the FBI that he met Boonie Moe in San Diego [PW-1: "if [the FBI] wrote that down, that is on them. Ask them why they said that. I never said that." (8/26/26 RT 133:18-134:1)];

(2) PW-1 testified that he never told the FBI that he did not use his phone while in Los Angeles [PW-1:"I don't remember that neither...I used my phone, so I don't know where that came from." (8/26/26 RT 134:9-17)]; and

(3) PW-1 testified that his trial testimony was not the first time he disclosed that, while waiting outside of the Level Hotel sitting inside of the BMW, defendant Wilson grabbed a firearm from PW-1's hand, pointed it towards the window, and said something to the effect of "Boy, they easy. I can get out and fuck them up right now" [PW-1: "That's what you are saying. That is what you are saying out your own mouth. I don't care what them papers say, none of that—I know what I said." (8/26/26 RT 121:2-12)].

**B. Legal Standard**

To prevail on a Napue claim, defendant bears the burden to show: "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010) (cleaned up). A "Napue claim succeeds only if three elements are satisfied," Panah v. Chappell, 935 F.3d 657, 664 (9th Cir. 2019), and the burden is on the defendant to show that these three factors are satisfied, see United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003). As set forth below, defendant fails to satisfy his burden for all three of the Napue prongs, any one of which is fatal.

Defendant first bears the burden of proving that the challenged testimony was "actually false." Critically, "[m]ere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement." United States v. Renzi, 769 F.3d 731, 752 (9th Cir. 2014); United States v. Fujinaga, 2022 WL 671018, at *2 (9th Cir. Mar. 7, 2022) ("'Mistaken, inaccurate, or rebuttable' testimony does not give rise to a Napue claim.") (cleaned up). The Ninth Circuit has further emphasized that testimony "susceptible to

multiple interpretations" is typically not the proper subject of a Napue claim. See Hampton v. Shinn, 143 F.4th 1047, 1070 (9th Cir. 2025). Instead, the challenged testimony must be "indisputably false." United States v. Lochmondy, 890 F.2d 817, 823 (6th Cir. 1989) (emphasis added).

The defendant must also show "a reasonable likelihood that the false testimony could have affected the judgment of the jury" to satisfy the materiality threshold. Panah, 935 F.3d at 664 (cleaned up). The materiality inquiry turns on the overall confidence in the verdict, not on creative conjecture. When a court has "full confidence that the jury would still have convicted," a defendant cannot prove materiality. Sivak v. Hardison, 658 F.3d 898, 913 (9th Cir. 2011). "[T]he question is not whether the defendant would more likely than not have a received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (cleaned up). "A Napue claim fails if, absent the false testimony or evidence, the [defendant] still received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Panah, 935 F.3d at 664 (cleaned up). Put simply, when a defendant establishes only a single witness's misleading testimony in the face of "devastating and largely unchallenged" evidence, there is no Napue violation. Id. at 667.

**C. Defendant Has Failed to Satisfy Any Prerequisite for a Napue Claim, Much Less All Three**

The Court should reaffirm its tentative denial of defendant's Napue claims, as each falls far short of any constitutional violation.

First, defendant has not met and cannot meet his burden to establish that PW-1's testimony was "actually false." Defense counsel asked PW-1 about his recollection of making certain statements to the FBI based on law enforcement reports. PW-1 answered those questions based on his own recollection, at times informing defense counsel "I never said that," "I don't remember that neither," and "I know what I said," among other things. (8/26/26 RT 133:18-134:1; id. at 134:9-17; id. at 121:2-12). But then counsel never followed up to attempt to establish the falsity of PW-1's statements. For example, he elected not to call as witnesses the FBI agents who authored the reports or who were present during the interviews --- nor did counsel ask the FBI agents who were called as government witnesses questions about PW-1's prior statements. At most, the identified responses are the classic types of "[m]ere inconsistencies or honestly mistaken witness recollections," which "generally do not satisfy the falsehood requirement." Renzi, 769 F.3d at 752.

Second, because defendant has failed to establish "actual falsity," he consequently cannot meet the second Napue requirement --- that is, to show that the government knew or should have known of this alleged falsehood.

Third, defendant's Napue claims independently fail because the purported false testimony was not material. Sivak, 658 F.3d at 913

(when a court has "full confidence that the jury would still have convicted," a defendant cannot prove materiality). The three cross-examination questions at issue pale in comparison to the significant evidence presented during trial establishing defendant's guilt, including (i) evidence and testimony showing defendant recruited two of the shooters and traveled with them to California on August 18, 2022 to stalk and kill Bowman; testimony, surveillance video, and cell tower data showing that defendant and other co-conspirators stalked Bowman from the night of August 18 until co-conspirators ambushed Bowman's vehicle around 5:30 p.m. on August 19, striking and killing S.R.; (iii) testimony and evidence showing defendant coordinated return flights for all co-conspirators shortly after S.R.'s murder; and (iv) evidence showing defendant and other OTF members celebrated and mocked Mr. Robinson's death, among other evidence. Accordingly, the Court should deny defendant's Napue claims.

**IV. Conclusion**

The Court should deny defendant's motion in full, as the government committed no violations of Brady or Napue.