CRAIG A. HARBAUGH (Bar No. 194309)
HARBAUGH LAW, PC
360 E. 2nd Street, Suite 800
Los Angeles, California 90012
Tel: (213) 986-8656
Email: craig@harbaugh.law

Attorney for Defendant
DEANDRE WILSON

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DURK BANKS, *et al*.,<br>*Defendants*. | No. 2:24-cr-621-MWF-2<br><br>**DEFENDANT DEANDRE WILSON'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**<br><br>Hearing Date: October 28, 2026<br>Hearing Time: 2:00 p.m.<br>Courtroom: 5A |

Defendant Deandre Wilson, by and through his counsel of record, Craig A. Harbaugh, renews his motion under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts One, Two, and Three and, in the alternative, to set aside the death-results finding on Count Three. The motion is based on this Notice, the attached Memorandum of Points and Authorities, the trial record, the records and files in this case, and any further evidence and argument the Court may permit.

Dated: September 30, 2026

Respectfully submitted

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH
Attorney for Deandre Wilson

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

A.The Only Object Any Witness Described Was to Find and Kill Quando Rondo ........ 4

B.Four Times the Crew Got Into Position to Kill, and Four Times It Broke Off Rather Than Be Seen ........ 4

C.No One Who Was at the Gas Station Testified ........ 4

D.The Government Told the Jury the Men in the Escalade Did Not Know They Were Being Hunted and That Robinson Was Not the Intended Target ........ 4

III. PROCEDURAL HISTORY ........ 8

IV. LEGAL STANDARD ........ 10

A.Judgment of Acquittal ........ 10

B.Federal Stalking Law ........ 10

V. ARGUMENT ........ 11

A.All Three Stalking Counts Fail Because the Course of Conduct Reached No One in the Escalade, and the Gunfire Is Not a Course of Conduct. ........ 11

1.Bowman Was Never Placed in Fear, and Nothing He Knew Could Have Made Fear Reasonable. ........ 12

2.The Attempt and Reasonable-Expectation Prongs Fail Because the Crew Made No Effort to Be Seen Before the Shooting. ........ 13

3.The Government's Reading Would Erase the Line Between Stalking and Murder. ........ 16

B.Count One Fails Because the Government Proved at Most an Agreement to Kill Bowman, Not to Stalk Him. ........ 16

C.Count Three Independently Fails Because Nothing in the Record Was Directed at Saviay'a Robinson. ........ 17

1.The Statute and the Court's Instruction Require Intent as to Robinson. ........ 17

2.Death Is the Enhancement, Not the Element. ........ 18

2.The Government Proved No Relationship Between Robinson and Bowman That the Statute Recognizes. ........ 18

3.As the Government Insisted, No Participant Targeted Robinson. .... 19

4.Foreseeability Is Not Intent, and Co-Conspirator Liability Cannot Supply an Offense No One Committed. .......................................... 20

D.The Death-Results Finding Fails Independently Because the Same Gunfire Cannot Be Both the Offense and Its Consequence. ......................... 21

VI. CONCLUSION................................................................................. 22

# TABLE OF AUTHORITIES
## CASES

*Burrage v. United States*,
571 U.S. 204 (2014) ........ 21

*Dubin v. United States*,
599 U.S. 110 (2023) ........ 16

*Jackson v. Virginia*,
443 U.S. 307 (1979) ........ 10

*Pinkerton v. United States*,
328 U.S. 640 (1946) ........ 20

*United States v. Bell*,
303 F.3d 1187 (9th Cir. 2002) ........ 10

*United States v. Conlan*,
786 F.3d 380 (5th Cir. 2015) ........ 11, 15, 17

*United States v. Gonzalez*,
905 F.3d 165 (3d Cir. 2018) ........ 15

*United States v. Gross*,
23 F.4th 1048 (8th Cir. 2022) ........ 18

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010) (en banc) ........ 10, 12

*United States v. Osinger*,
753 F.3d 939 (9th Cir. 2014) ........ 11

*United States v. Pineda-Doval*,
614 F.3d 1019 (9th Cir. 2010) ........ 21

*United States v. Shrader*,
675 F.3d 300 (4th Cir. 2012) ........ 11, 15, 17

*United States v. Uhlenbrock*,
125 F.4th 217 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2853 (2025) ........ 15

## STATUTES

18 U.S.C. § 1111(a) .......... 16
18 U.S.C. § 115(c)(2) .......... 18
18 U.S.C. § 1958 .......... 4, 8
18 U.S.C. § 2261(b) .......... 8, 16, 21
18 U.S.C. § 2261A .......... *passim*
18 U.S.C. § 2266(2) .......... 10, 12, 19
18 U.S.C. § 371 .......... 8

## RULES

Fed. R. Crim. P. 29 .......... 10

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I. INTRODUCTION

Even accepting all evidence and inferences in the government's favor, Mr. Wilson is not guilty of Counts One, Two, and Three as a matter of law.[2] Section 2261A does not punish killing. It punishes a course of conduct that produces an effect on the victim's mind: reasonable fear of death or serious bodily injury, or substantial emotional distress that the conduct causes, attempts to cause, or would be reasonably expected to cause. At best, the government proved stealth, not stalking: a killing designed so that the target would never know it was coming. Those verdicts and the death-results finding fail for four independent reasons.

*First*, the government proved none of those effects, by any route the statute allows. That is fatal to all three counts. Nothing in the record shows that Bowman or anyone else in the Escalade knew they were being followed, much less that any of them was afraid. Fear requires awareness. The Court instructed that the government had to prove Bowman himself was placed in fear.[3] Men who know they are being hunted do not pull into a gas station and shop at the convenience store. No one from the Escalade testified, not even Bowman or the hired driver. The only evidence, the surveillance video, shows why the government's fear theory fails. At the very moment shots were fired, Bowman sat in the Escalade while Robinson stood beside it:

---

[1] Citations to the trial transcript are by volume, page, and line, *e.g.*, 3RT 216:22-23. Government trial exhibits are cited as GX. Exhibits to the accompanying declaration are cited as Ex. A through Ex. G.

[2] Mr. Wilson maintains his innocence. Because Rule 29 requires the evidence to be viewed in the light most favorable to the prosecution, this motion proceeds on the government's version of events. Nothing in this motion is an admission by Mr. Wilson in this or any other proceeding, and Mr. Wilson reserves all rights and objections, including as to the severed counts.

[3] Instruction 21.




Figure 1. GX 109 at 00:23 (Ex. F-1).

Nor did this conduct attempt to cause substantial emotional distress, and nothing about it would be reasonably expected to do so. Four times the men got into position to kill Bowman, and four times they stood down.[4] They broke off over police, bystanders, and armed security. Not one of those decisions turned on what Bowman might notice. He never did.

*Second*, Count One independently fails because the government's proof went to a different object than the one charged. Its cooperating witnesses testified that the purpose of the operation was "[t]o go kill [Quando Rondo]," and to do so for a price.[5] An agreement to kill by surprise is not an agreement to frighten.

*Third*, Count Three required proof of both intent and effect as to Saviay'a Robinson, and the government proved neither. No record made before the shooting named Robinson a target of anything by anyone, and the bureau's own bulletin called

---

[4] 5RT 305:15-22; 9RT 91:10-17; 6RT 8:16-21, 17:14-19; 8RT 110:25-111:1. GX 13 at 44, 47 (Ex. B-1 to B-2).

[5] 9RT 19:5-8; 8RT 58:19-21.

him an associate struck in the crossfire.[6] The government's shooter testified that he fired at "[n]obody, just the truck," because he "didn't see nobody" but he was trying to shoot Quando.[7] The government told the jury the shooters fired "missing their intended target and killing Saviay'a Robinson."[8] A willingness to kill whoever was with Bowman is not intent as to Robinson, and the Court required proof of focus on particular people.[9] Nor can Count Three be established through Bowman. The statute permits the effect to be felt only by the person named in the count, an immediate family member, or a spouse or intimate partner. The government proved none of those. The only relationship any witness described was cousins.

*Fourth*, the death-results finding fails even if the stalking counts stood. The death must result from the course of conduct, and the only conduct that reached the Escalade was the gunfire. The killing cannot be both the offense and the enhancement.

The government's lead detective testified that the occupants did not know the suspects were coming for them, and its closing told the jury they "didn't know these defendants were right behind them, watching them, hunting them."[10] Both are accurate. Both are fatal. A plan that depends on surprise cannot produce the awareness reasonable fear requires, and conduct broken off to avoid notice is not an attempt to cause distress. Three seconds of gunfire cannot be the pattern, the intent as to Robinson, and the death that results from it. The government proved an agreement to kill and a killing. Section 2261A punishes neither. The Court should enter judgments of acquittal on Counts One, Two, and Three, and, in the alternative, set aside the death-results finding.

/ / /

---

[6] 4RT 127:15-22.
[7] 8RT 119:20-120:1.
[8] 13RT 27:5-6.
[9] 12RT 17:16-21.
[10] 3RT 119:20-22, 128:15-18. 13RT 26:1-2.

## II. STATEMENT OF FACTS

### A. The Only Object Any Witness Described Was to Find and Kill Quando Rondo

Kavon Grant testified that he gathered information on Quando Rondo's location, and that the purpose was "[t]o go kill" "Quando." 9RT 19:5-8.

Keith Jones testified that Wilson called him on a group FaceTime, said he "had a location on dude," identified him as Quando Rondo, and said, "Bro got a million for us." 8RT 41:23-25.[11] Jones understood that to mean "a million dollars for us to catch Quando and kill him," *id.* 44:8-11, and that to earn it he would have to "[k]ill Quando." *Id.* 58:19-21.

Kacey Hester agreed on cross that he came to California "there for murder" and that this was "the only purpose" for his being in the state. 6RT 144:10-14.

No witness described an effort to place Bowman in fear. Only a plan to kill.

### B. Four Times the Crew Got Into Position to Kill, and Four Times It Broke Off Rather Than Be Seen

Just past midnight on August 19, 2022, both cars, a white BMW and a white Infiniti, were outside the Level Hotel, because Grant had determined that Quando Rondo was staying there. 9RT 89:4-14. The Infiniti was "on standby," but police vehicles kept driving past, so that "it was like, damn, this is kind of hot, like police steady riding." 5RT 305:15-19. Hester agreed that the decision was "made not to try to shoot them outside." *Id.* 305:20-22. But for the police, the murder "would . . . have gone down right then and there." *Id.* 307:5-8. Grant described the same police presence, and when "[t]he police just spinned around twice," the response was "[l]et's go around the block." 9RT 89:24-90:2. Asked whether he thought they would have an opportunity to kill Quando that night, Grant answered no. *Id.* 91:15-17.

---

[11] The jury acquitted Mr. Wilson on Counts Four and Five, which charged conspiracy and the substantive offense of use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. ECF No. 714.

The crew returned the next morning. They were "circling around" and "trying to see if it was a moment where we can get them," but it "wasn't a good time, because it was so many random people right there." 6RT 8:16-21. The Escalade left and the crew followed. *Id.* 8:9-14.

At the dispensary the two cars discussed by phone that "[s]omebody should go in there and see where they at." 6RT 16:23-25. Hester would not go in because he did not know whether there were cameras. *Id.* 17:1-3. David Lindsey went instead, and Hester testified to what he reported: "He said that he really couldn't see them. They was in the back somewhere. But somebody -- there was an armed security and a, like -- basically, like, no, it couldn't be done." *Id.* 17:14-19. The crew got back in the cars and left. *Id.* 18:6-11.[12]

The Escalade stopped next at a BAPE clothing store, and the crew parked around the corner. 8RT 110:22-23. Jones saw the crew go in but did not see Bowman: "I seen the crew. I didn't see -- like, visually see Quando." *Id.* 110:25-111:1. Around 5:00 p.m., the Escalade was at the curb with men standing on the sidewalk beside it. GX 13 at 44 (Ex. B-1). Over the next four minutes the following vehicle passed three times, the last pass alongside and within a car's width. GX 13 at 47 (Ex. B-2); GX 7 at 8 (Ex. A). No one got out, and no one stopped. When the Escalade left, the crew followed and briefly lost it. 6RT 26:5-8; 9RT 106:18-20.

The Escalade made a U-turn into the Mobil station and stopped outside the convenience store, and the occupants got out and went inside. 3RT 228:19-25. While they were out of the vehicle the Infiniti circled the station and drove past the parked Escalade. *Id.* 229:3-7; GX 13 at 62 (Ex. B-3), published at *id.* 229:18. They bought items, walked back out, and took their seats, with the driver pumping gas and Robinson standing outside the rear passenger door. *Id.* 230:18-231:3, 232:18-22.

---

[12] Hester called Lindsey CVL Shorty. 6RT 18:4. He confirmed on cross that "the person you are calling CVL Shorty is Mr. Lindsey." 5RT 285:25-286:2; *see also id.* 284:9-11. Hester also testified, "I know Lindsey had got out." 6RT 15:25.

No witness testified that anyone from either car approached the Escalade, spoke to anyone in it, or was seen by anyone in it at any point before the gunfire. 5RT 305:15-22; 6RT 8:9-21, 17:1-3, 17:14-19; 3RT 229:3-7; GX 13 at 44, 47 (Ex. B-1 to B-2).

Three seconds after the first weapon appears, the men are running down the alley away from the station with their backs turned. On one camera no person appears at all. What that camera recorded was a shadow on the pavement with an arm extended.[13] Jones testified that when he fired he was pointing his weapon at "[n]obody, just the truck," because "I didn't see nobody." 8RT 119:20-120:3. Hester agreed that "you really didn't even know what you were firing at" and that "[y]ou didn't know who was in that car," and could not say how many people were in the Escalade. 6RT 220:9-11, 156:15-19. Inside the store the government's composite shows an ordinary Friday afternoon. GX 126 at 3:50 (Ex. G-1 to G-2). Seconds later those same people are on the floor and the alley behind them is already clear. GX 126 at 3:52 (Ex. G-3).

**C. No One Who Was at the Gas Station Testified**

Five men were in the Escalade. Carias identified four of them as Tyquian Bowman, Tyreek Lester, Carlos Johnson, and Saviay'a Robinson. 3RT 216:22-23, 226:20-24. The fifth was the driver, whom Carias described as "a hired driver, otherwise unrelated to the individuals in the car," and who was pumping gas when the shots were fired. *Id.* 121:12-14, 230:18-231:3. Investigators interviewed the driver and built part of their case on his account. *Id.* 129:4-14. The driver did not testify.

No one else who was present during the shooting testified. Neither Bowman nor his fellow passengers testified. No store employee and no customer testified. Instead, the government called law enforcement officers, the medical examiner, a cell tower

---

[13] The first weapon appears at camera stamp 16:23:50, the men are running away from the station at 16:23:53, and the alley is empty at 16:23:55. GX 102 at 00:26, 00:29, 00:32 (Ex. E-1 to E-3). On the camera that looks out from the station, a figure is at the edge of the frame at 16:23:51 and is gone at 16:23:53. GX 101 at 00:06, 00:08 (Ex. D-1 to D-2). The shadow appears at GX 100 at 00:23 (Ex. C).

expert, and three members of the crew, two of whom fired at the Escalade.

Nothing in the government's evidence named Robinson before he was killed. Hester had "no idea who they are" as to the people at the hotel, including Robinson. 6RT 145:22-24. Carias agreed that the bureau's own intelligence bulletin "describes Saviay'a Robinson as an associate of Mr. Bowman who was struck in the crossfire," and that he "didn't testify about any record made before August 19, 2022, naming Saviay'a Robinson a target of anything by anyone." 4RT 127:15-22.

### D. The Government Told the Jury the Men in the Escalade Did Not Know They Were Being Hunted and That Robinson Was Not the Intended Target

Detective Carias testified that after reviewing the video, "it appeared that it was an ambush shooting." 3RT 127:25-128:1. Asked by the Court what he meant, Carias answered that the suspects "walked through this alley, and they shot into this Escalade while the occupants were inside of the Escalade and not knowing that these suspects were coming for them." *Id.* 128:15-18. In closing the government told the jury the same thing: the men in the Escalade "didn't know these defendants were right behind them, watching them, hunting them." 13RT 26:1-2. It identified the acts it called the course of conduct as the surveillance outside the hotel, the following across Los Angeles, the search for a place to act, and the calls between the two cars. *Id.* 34:1-8.

The government told the jury that "[t]he purpose of the conspiracy was to kill Quando Rondo." 13RT 35:5-6. The government explained to the jury that the co-conspirators "ambushed that Escalade and unleashed a barrage of gunfire, missing their intended target and killing Saviay'a Robinson," and that they "didn't care about the other people at that gas station." 13RT 27:3-8. It argued Count Three as a foreseeability case, telling the jury it had to find that "a co-conspirator ended up stalking Saviay'a Robinson" and that stalking Robinson was "a foreseeable and natural consequence from the conspiracy." *Id.* 35:1-4. The proof it offered for both was the shooting: "[i]t was foreseeable to all of these defendants that when they opened fire, they would kill somebody else in the vehicle." *Id.* 35:8-10.

## III. PROCEDURAL HISTORY

Trial Count One[14] charged conspiracy to commit stalking of Tyquian Bowman, in violation of 18 U.S.C. § 371. Trial Count Two charged stalking Bowman, in violation of 18 U.S.C. §§ 2261A(2)(A) and (B), with a separate finding on the use of a dangerous weapon under § 2261(b)(3). Trial Count Three charged stalking Robinson under the same provisions, with a separate finding on death results under § 2261(b)(1). Trial Counts Four and Five charged conspiracy and the use of interstate commerce facilities in the commission of murder-for-hire. 18 U.S.C. § 1958(a).

The Court reserved decision on the Rule 29 motions. When the government rested, the Court stated that "any motions will be deemed reserved with no prejudice to the defendants." 10RT 276:25-277:1. The following morning it confirmed that the motions "are deemed made and renewed" and would "address the state of the evidence as it exists at the time." 11RT 73:24-74:3.[15]

At the charge conference the Court construed the two stalking provisions at issue. On the reasonable-fear alternative in subsection (A), the Court rejected the suggestion that the provision carries no subjective element, explaining that "there is the subjective element that the victim actually was aware of -- to be placed in fear. . ." 12RT 9:6-12. The government agreed that the Court's paragraph on that alternative "is an accurate statement of the law." *Id.* 12:6-7. Instruction 21 carries that ruling into the charge: the government must prove that the course of conduct "placed Tyquian Bowman (a/k/a 'Quando Rondo') in fear of death or serious bodily injury," and "[t]he fear must have been reasonable under the circumstances known to" him at the time.

---

[14] The Fourth Superseding Indictment charged seven counts. Counts One and Seven were severed before trial, and the remaining counts were renumbered for the jury, so that Count Two of the Fourth Superseding Indictment became trial Count One and so on through trial Count Five.

[15] At the close of the defense case the Court deemed the motions renewed again and took them under submission. 12RT 115:8-12.

Instruction 21. At the government's request the Court also added a sentence distinguishing the two alternatives: "While the government must prove that Tyquian Bowman (a/k/a 'Quando Rondo') was in fear of death or serious bodily injury to satisfy the reasonable-fear alternative, the substantial-emotional-distress alternative does not require proving subjective awareness on the part of the victim." Instruction 21. Mr. Wilson objected to that addition, and the objection is preserved. 12RT 13:15-16, 14:5-11.

On the count naming Robinson, the Court held that the government would have to prove "that the alleged conspirators had enough awareness of who was in the Escalade and what was going to happen that they -- it wasn't just, oh, there is -- there might be somebody else in the Escalade with Quando Rondo, but rather, there were particular people." *Id.* 17:17-21. The Court called that "a heavy burden here." *Id.* 17:16. The government would "have to convince the jury that their focus was on that particular person." *Id.* 18:6-7. Instruction 26 carries that ruling into the charge: "The government must prove the required intent as to a particular person (for this Count, Saviay'a Robinson)." Instruction 26. The Court also held that the conspirators did not have to know the person's identity, and Instruction 26 says so: "However, the government is not required to prove that the defendant knew the name or specific identity of that particular person." Instruction 26; 12RT 18:1-7. Mr. Wilson objected to that addition as well, and that objection is preserved. *Id.* 20:1-5.

Instruction 27 required the government to prove "that the stalking was the cause in fact of Saviay'a Robinson's death," meaning "that but for the stalking as charged in Count Three, Saviay'a Robinson would not have died," and "that Saviay'a Robinson's death was a reasonably foreseeable consequence of the stalking."

On September 11, 2026, the jury found Mr. Wilson guilty on Counts One, Two, and Three, and answered yes to the dangerous-weapon and death-results questions. It found him not guilty on Counts Four and Five. ECF No. 714.

## IV. LEGAL STANDARD

### *A.* Judgment of Acquittal

On a motion for judgment of acquittal the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In applying that test, a court neither weighs the evidence nor assesses credibility, and resolves supported conflicting inferences for the prosecution. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc). But a verdict cannot rest on "mere speculation, rather than reasonable inference," or on "a total failure of proof of [a] requisite" element. *Id.* at 1167 (citations omitted). More than a "mere modicum" of evidence is required. *Id.* at 1164. Where the Court reserves decision, it "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

### B. Federal Stalking Law

Section 2261A(2) makes it an offense, with one of the enumerated intents toward "another person," to use a facility of interstate or foreign commerce "to engage in a course of conduct that" either "(A) places that person in reasonable fear of the death of or serious bodily injury to" a person or animal the statute lists, or "(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" to that person, an immediate family member, or a spouse or intimate partner. 18 U.S.C. § 2261A(2). The effect clauses modify the course of conduct, so the pattern must produce the fear or the distress.

A course of conduct is "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). The Ninth Circuit treats that pattern requirement as an element, and omitting it from the instruction is error because it permits "a conviction without the finding of a statutory element." *United States v. Bell*, 303 F.3d 1187, 1192 (9th Cir. 2002).

/ / /

Construing the earlier version of this provision, which reached only a course of conduct "that causes substantial emotional distress to that person," the Ninth Circuit adopted the Fourth Circuit's description of the third element: the conduct "must in fact cause substantial emotional distress to the intended victim or place that person in reasonable fear of the death of, or serious bodily injury . . . ." *United States v. Osinger*, 753 F.3d 939, 947 (9th Cir. 2014) (alterations and internal quotation marks omitted) (quoting *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)). The 2013 amendments added the attempt and objective alternatives to subsection (B). They did not change subsection (A).

Section 2261A(2) "unambiguously makes the victim, rather than the course of conduct, the unit of prosecution," because the statute "requires that his intimidating conduct actually induce fear in 'that person.'" *Shrader*, 675 F.3d at 313. The Fifth Circuit reads the subsection to "require[] that the defendant act with intent towards a particular person." *United States v. Conlan*, 786 F.3d 380, 387 (5th Cir. 2015) (internal quotation marks omitted) (quoting *Shrader*, 675 F.3d at 313-14). Subsection (2)(A) requires that the course of conduct place the person named in the count in reasonable fear; the persons and animals listed in paragraph (1)(A) are those whose death or serious bodily injury may be feared, not alternative persons who may do the fearing. Subsection (2)(B) is where the statute permits the effect to be experienced by someone else, and the list there is closed: the person named in the count, an "immediate family member (as defined in section 115)" of that person, or a spouse or intimate partner. 18 U.S.C. §§ 2261A(2)(A), (B).

## V. ARGUMENT

### A. All Three Stalking Counts Fail Because the Course of Conduct Reached No One in the Escalade, and the Gunfire Is Not a Course of Conduct.

Every act the government calls the course of conduct went unnoticed, and nothing in the record shows that any of the men in the Escalade perceived any of it. What reached them was the gunfire, and it lasted three seconds.

A three-second burst is not a course of conduct. The effect clauses attach to the course of conduct, which the statute defines as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). The last act in a pattern cannot be the source of the effect the pattern is required to produce. If the final act were enough, the pattern requirement would be surplusage, because every planned killing is preceded by at least two acts. That failure defeats all three remaining counts.

1. Bowman Was Never Placed in Fear, and Nothing He Knew Could Have Made Fear Reasonable.

The government had to prove both halves of the reasonable-fear alternative in Instruction 21, and both require something Bowman knew. The Court's instruction draws the line: the substantial-emotional-distress alternative "does not require proving subjective awareness on the part of the victim," but "the government must prove that Tyquian Bowman (a/k/a 'Quando Rondo') was in fear of death or serious bodily injury to satisfy the reasonable-fear alternative." Instruction 21. On the reasonable-fear alternative the government agreed. 12RT 11:22-23, 12:6-7.

On this record there is nothing. No one inside the Escalade testified, so there is no evidence of what any of them perceived at any point across the two days, and no witness described a reaction of any kind. No one approached the Escalade, no one spoke to anyone in it, and the shots came from an alley behind the station. The government told the jury, through its lead detective and its closing argument, that the men did not know the shooters were coming. A finding of reasonable fear on this record would rest on "mere speculation, rather than reasonable inference," and on "a total failure of proof of [a] requisite" element. *Nevils*, 598 F.3d at 1167.

The government's own exhibits show the occupants behaving as men who knew nothing. They stood on the sidewalk beside the Escalade for four minutes while the trailing car passed three times, the last within a car's width. GX 13 at 44, 47 (Ex. B-1 to B-2). At the gas station they went inside while the Infiniti drove past the parked Escalade, then came back out and took their seats while the driver pumped gas. Figure

2. 3RT 228:19-229:7, 230:18-231:3. Those are not the movements of men who knew they were being followed.




Figure 2. GX 13 at 62 (Ex. B-3).

2. The Substantial-Emotional-Distress Alternative Fails on Every Route Because Nothing the Crew Did Before the Shooting Reached Bowman.

The government had to prove the effect by one of the three routes subsection (B) supplies, and it proved none of them. The Court instructed that the substantial-emotional-distress alternative "does not require proving subjective awareness on the part of the victim." Instruction 21. That relieves the government of proving what Bowman knew. It does not relieve the government of proving that the course of conduct produced the effect.

Subsection (B) reaches a course of conduct that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress." The causation route fails for the reason already given: the only conduct that reached Bowman was the gunfire, and the last act of a pattern cannot be the effect the pattern is required to produce. The attempt and reasonable-expectation routes fail because nothing the crew did before the shooting was an effort to make its presence known to Bowman.

An attempt to cause substantial emotional distress requires an effort to produce it. Three participants testified for the government, and no one described an effort to frighten Bowman, a step taken to bring that about, or an attempt to do so that failed. What they described was an assassination, and an assassination requires the opposite. 9RT 19:5-8; 8RT 58:19-21; 6RT 144:10-14. Over two days and five stops no one from either car approached the Escalade, and at each stop the crew gave up a chance to be noticed to keep a chance to kill. The only attempt was through an alley behind the building. Conduct calculated to go unnoticed is not an attempt to cause distress.

The total time any person at that station could have perceived an armed person was about three seconds. On the third camera no person appears at all, only a shadow on the pavement with an arm extended.



Figure 3. GX 100 at 00:23 (Ex. C).

No reasonable person in Bowman's position would have suffered distress from conduct he had no way to perceive. The prong asks, "whether, in light of the evidence presented in this case, a reasonable person in the same or similar circumstances as the victim would suffer substantial emotional distress as a result of the intended course of conduct." Instruction 21. The circumstances here are the ones the record establishes: two days on which nothing reached the Escalade, and a following no one inside ever

saw. A man shopping in a convenience store and returning to a car being fueled is not distressed by a clandestine operation he never learns of. The statute measures the course of conduct, not the shooting that ended it.

The government's own case sets the measure. It gave the Court *United States v. Uhlenbrock*, 125 F.4th 217 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2853 (2025), at the charge conference. 12RT 15:2-8. The Court found it "helpful on the legal question" and supportive of telling the jury that the two prongs differ. *Id.* 15:18-22. The difference does not dispense with the effect. The defendant in *Uhlenbrock* published his former partner's intimate images and wrote stories in her name giving her occupation and employer and inviting men to look for her when they flew. The Fifth Circuit sustained the verdict on the objective route because "[p]eople could link the posts to YT; she found out about them from a family friend," and on the causation route because the victim testified to "instant fear and disgust," to spending "eight, nine hours a day scouring the internet," and to becoming "very reclusive and paranoid." *Uhlenbrock*, 125 F.4th at 227-28. That course of conduct was built to be found, and it was found. The conduct here was built not to be found, and no one found it. The victim there testified. No one from the Escalade did.[16]

Not one of the acts the government identified in closing reached Bowman. 13RT 34:1-8. The proof it offered on the effect element was that "the victims knew about it" and that the jury "saw Quando Rondo's reaction after the shooting." *Id.* 34:8-13. The first is contrary to the government's own evidence. The second is a reaction to being shot at, which is the final act, not the course of conduct the statute measures.

---

[16] *See also United States v. Gonzalez*, 905 F.3d 165, 179-81 (3d Cir. 2018) (three-year campaign of accusations, letters, and recruited surveillance, known to the victim); *Conlan*, 786 F.3d at 385 (year-long campaign of messages, calls, and in-person contact with the victim, her family, and her coworkers); *Shrader*, 675 F.3d at 305-06 (calls to the victim's unlisted home and a thirty-two page letter invoking two earlier murders).

The causal link runs from the pattern to the effect, and the government's exhibits sever the two. At the first instant the men are visible in the alley, the channel covering the pumps and the convenience store shows an ordinary afternoon. GX 109 at 00:23 (Ex. F-1); 4RT 19:2-5. The same is true seconds later. GX 109 at 00:25 (Ex. F-2).

#### 3. The Government's Reading Would Erase the Line Between Stalking and Murder.

Stalking is measured by what the course of conduct does to the person named. This course did nothing to him until the shooting. Congress has a name for a killing carried out that way, and it is not stalking. Federal law makes "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing" murder in the first degree. 18 U.S.C. § 1111(a). Lying in wait is a category defined by the victim's ignorance. Section 2261A is defined by the effect the conduct has on the victim's fear or distress. The two describe opposite relationships between the defendant's conduct and the victim's mind.

The Court instructed that "[a] car, a cell phone, an airplane, and the internet are each facilities of interstate commerce or foreign commerce." Instruction 21. Nearly every planned killing in the United States involves a car or a phone. If the elements are satisfied by preparation the victim never perceived plus the killing itself, the statute reaches any homicide preceded by two acts, and it carries a life maximum whenever death results. 18 U.S.C. § 2261(b)(1). A construction that would make the ordinary case the statute's central application "places at the core of the statute its most improbable applications." *Dubin v. United States*, 599 U.S. 110, 130 (2023). On the government's reading, the ordinary planned murder is always a stalking.

### B. Count One Fails Because the Government Proved at Most an Agreement to Kill Bowman, Not to Stalk Him.

Count One fails for want of the agreement it charged. The object charged, under Instruction 18, was an agreement to commit the crime of stalking Bowman. The government's proof went to a different object. Its own cooperating witnesses described an agreement to kill, not an agreement to stalk.

The purpose of the operation was "[t]o go kill him," meaning Quando Rondo, and what earned the million dollars was to "[k]ill Quando." 9RT 19:5-8; 8RT 44:8-11, 58:19-21. The government described the same object in closing, telling the jury that "[t]he purpose of the conspiracy was to kill Quando Rondo." 13RT 35:5-6.

Taken at its highest, that testimony goes to an agreement to kill a named man. The first element required an agreement to commit the crime of stalking, which is an agreement to produce an effect on that man's mind. Proof of an agreement to commit a different crime does not satisfy it. Instruction 18.

The rest of the evidence describes how the agreement was carried out, and Bowman learned nothing at any step of it. An agreement to remain unseen until the moment of the shooting is not an agreement to produce an effect that requires awareness of the conduct.

Section 2261A(2) lists the intent to kill among the qualifying mental states, but it separately requires an effect. Treating one as proof of the other collapses the two.

### C. Count Three Independently Fails Because Nothing in the Record Was Directed at Saviay'a Robinson.

Even if the evidence sufficed on Counts One and Two, it did not reach Robinson. The statute makes the person named in the count the unit of prosecution, and the record contains no intent directed at Robinson, no surveillance of Robinson, and no course of conduct as to Robinson.

#### 1. The Statute and the Court's Instruction Require Intent as to Robinson.

The text ties every element to one individual. The defendant must act with the enumerated intent toward "another person," and the course of conduct must place "that person" in reasonable fear or cause substantial emotional distress to "that person." 18 U.S.C. § 2261A(2); *see Shrader*, 675 F.3d at 313; *Conlan*, 786 F.3d at 387.

Instruction 26 says the same thing twice, and the Court explained at the charge conference that the government would have to prove more than that someone else might be in the Escalade. It would have to "convince the jury that their focus was on

that particular person." 12RT 18:6-7. The Court called it "a heavy burden here." *Id.* 17:16. The government did not dispute the requirement; its position was that the conspirators did not have to know Robinson by name. *Id.* 17:12-14, 17:22-25.

The Eighth Circuit vacated a Section 2261A conviction where the government proved a campaign against one person and no intent toward the second person named in the indictment. *United States v. Gross*, 23 F.4th 1048, 1055 (8th Cir. 2022). The count naming an employee the defendant encountered on arrival failed because "[t]he government presented no evidence that when Gross left his home in Missouri that morning, he knew Liu would be working at Tea Spa Massage," and no evidence of any ill will until after arrival. *Id.*

*Gross* construes the travel offense in subsection (1). The point it establishes is that intent toward the person a defendant set out to reach does not transfer to a second person he encounters at the scene.

2. Death Is the Enhancement, Not the Element.

On Count Three the government's proof of substantial emotional distress was that "Saviay'a Robinson is dead." 13RT 34:12-13. Death is the result that Section 2261(b)(1) makes an enhancement. It is not the effect that Section 2261A(2)(B) makes an element. 18 U.S.C. §§ 2261(b)(1), 2261A(2)(B). The government addressed the element collectively, asking whether the conduct would cause substantial emotional distress to "the victims." 13RT 33:21-24. Count Three named one.

3. The Government Proved No Relationship Between Robinson and Bowman That the Statute Recognizes.

The only category that could reach Bowman is immediate family member, which Section 115 defines as "his spouse, parent, brother or sister, child or person to whom he stands in loco parentis," or "any other person living in his household and related to him by blood or marriage." 18 U.S.C. § 115(c)(2).

The government proved no relationship that met that definition. Its own intelligence bulletin described Robinson as an associate, and the only family description anywhere in the testimony is a cousin. 4RT 127:15-18; 8RT 131:15-16. A

cousin reaches Section 115 only as a household member related by blood or marriage, and no witness placed Robinson in Bowman's home.

4. As the Government Insisted, No Participant Targeted Robinson.

The government's own account of the shooting negates intent toward Robinson. It told the jury the shooters were "missing their intended target" and did not care about anyone else at the station. 13RT 27:3-8. Its theory was that the crew would have killed whoever was with Bowman, and it said so: they "didn't get the main target, but they got his guy [Robinson]." *Id.* 169:4-6. An intended target who is someone else is not intent as to Robinson. "His guy" is a category, not a person. A standing readiness to kill whoever happens to be with the target is the opposite of the focus on a particular person that the statute requires.

Every witness who could speak to what the shooters saw testified that they saw no one. 8RT 119:20-120:3; 6RT 220:9-11, 156:15-19; 9RT 106:18-20. Robinson, for his part, was standing outside the rear passenger door while the driver finished pumping gas. 3RT 232:18-22. A man in reasonable fear of death does not stand at an open car door while the driver tops off the tank.

Every reference to Robinson by name or nickname in the government's evidence came after he was dead, and Carias identified no record from before August 19 naming Robinson a target of anything. 10RT 131:9-11, 134:8-11; 4RT 127:19-22.

The most the evidence showed is that the crew knew Bowman moved with a group. The Court held that insufficient and required focus on a particular person, identified by something: "it could have been the guy who was wearing certain clothes, or the guy who was in the backseat, or whoever." 12RT 18:3-5. No witness supplied that. No one described a second man the crew was looking for, watching, or waiting on. Instruction 26 relieves the government of proving that anyone knew Robinson's "name or specific identity." It does not relieve the government of proving that someone had him in mind.

Even if intent could be found, Count Three requires a pattern of two or more acts evidencing a continuity of purpose. 18 U.S.C. § 2266(2); Instruction 26. Every act the evidence established was directed at finding Bowman. The single act that touched Robinson was the shooting, and one act is not a course of conduct. Nor can the shooting work backward. That Robinson was struck proves neither that anyone formed the enumerated intent toward him beforehand nor that the earlier acts were undertaken as to him.

5. Foreseeability Is Not Intent, and Co-Conspirator Liability Cannot Supply an Offense No One Committed.

Co-conspirator liability distributes an offense among those who agreed to it. It does not create one. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), and Instruction 30 both require that someone committed the offense charged in the count, and for the reasons in subsections 1 through 3, no participant did. The same defect disposes of the aiding-and-abetting theory, which also requires that someone committed the charged offense and requires advance knowledge of the specific crime in the count, not of "conduct directed at some other person." Instruction 28.

The government's answer was foreseeability. It told the jury that the stalking of Robinson was a foreseeable consequence of the conspiracy and offered the shooting itself as the proof. 13RT 35:1-4, 35:8-10, 65:23-25. The fifth *Pinkerton* element is conjunctive: the offense must have fallen within the scope of the unlawful agreement and have been a foreseeable consequence of it. A stalking of Robinson was outside the scope of an agreement to kill Bowman, and a killing that occurs in the execution of that agreement does not convert into a separate stalking offense against the person killed.

Foreseeability is also the wrong question. Section 2261A is a specific-intent statute, and a result that was foreseeable is not an intent that was formed. Reading *Pinkerton* to supply the intent element would let co-conspirator liability do what the Court told the jury it could not.

**D. The Death-Results Finding Fails Independently Because the Same Gunfire Cannot Be Both the Offense and Its Consequence.**

Section 2261A defines an offense that is complete when a course of conduct produces fear or distress. Section 2261(b)(1) then raises the maximum to life if "death of the victim results." A result is a consequence of something that came before it. Congress used both kinds of language in the same subsection: Section 2261(b)(3) reaches the offender who "uses a dangerous weapon during the offense." 18 U.S.C. § 2261(b)(1), (3). During describes conduct forming part of the offense. Results describe what follows from them.

On the government's theory the gunfire does both jobs at once. It is the only act that could have placed Robinson in fear, so it supplies the effect that completes the stalking, and it is also the death that results from that stalking. The same seconds cannot be both the offense and its consequence. If the shooting is the offense, there is no antecedent offense from which a death could result, and the enhancement has nothing to attach to. The Court's own instruction shows the circularity: asking whether Robinson would have died but for the stalking answers itself when the stalking is the shooting. Instruction 27.

Instruction 27 required but-for causation and foreseeability, both measured from the stalking charged in Count Three. A results-from element ordinarily requires but-for causation, *Burrage v. United States*, 571 U.S. 204, 210-11 (2014), and the Ninth Circuit requires proximate cause for the result element of a federal offense, which in turn requires that the harm be a foreseeable result, *United States v. Pineda-Doval*, 614 F.3d 1019, 1027-28 (9th Cir. 2010). Both halves fail for the same reason. The cause of Robinson's death was the decision to open fire on the Escalade, and nothing that preceded the gunfire was directed at him. The government asked the jury to measure foreseeability from the stalking of Bowman. 13RT 65:23-25. That is not causation traced to the stalking of Robinson.

## VI. CONCLUSION

For the foregoing reasons, Mr. Wilson respectfully requests that the Court enter judgments of acquittal on Counts One, Two, and Three, and, in the alternative, set aside the death-results finding on Count Three.

Respectfully submitted,

Dated: September 30, 2026

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH
Attorney for Deandre Wilson

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for defendant Deandre Wilson, certifies that this brief contains 6,990 words, which complies with the word limit of L.R. 11-6.1.

Dated: September 30, 2026

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH

# DECLARATION OF CRAIG A. HARBAUGH

I, Craig A. Harbaugh, declare:

1. I am an attorney licensed to practice law in the State of California and admitted to practice before this Court. I am counsel of record for defendant Deandre Wilson. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify competently to them.

2. Attached as Exhibits A and B are true and correct copies of pages of exhibits admitted in evidence at trial. Attached as Exhibits C through G are true and correct copies of still frames I captured from exhibits admitted in evidence at trial and played to the jury. The trial exhibit from which each page or frame was taken, and for each frame the point in the recording, appear in the accompanying memorandum or in paragraph 3 below.

3. Except as stated here, I did not alter, crop, enhance, or annotate any page or frame. Exhibit G-2 is an enlargement, by magnification only, of the left panel of the frame at Exhibit G-1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 30, 2026, in Los Angeles, California.

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH