BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
MICHAEL J. MORSE (Cal. Bar No. 291763)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
1400/1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3667/3535/0813
Facsimile: (213) 894-0142
E-mail: ian.yanniello@usdoj.gov
michael.morse@usdoj.gov
daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEANDRE WILSON AND DAVID LINDSEY,<br><br>Defendants. | No. CR 24-621(D)-MWF-2, -4<br><br><u>GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL, OR FOR A NEW TRIAL</u> |

Plaintiff United States of America, by and through its counsel of record, hereby files its Omnibus Opposition to defendants Deandre Wilson's and David Lindsey's Motions for Judgment of Acquittal, or For a New Trial.

//

//

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 14, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

/s/

IAN V. YANNIELLO
MICHAEL J. MORSE
DANIEL H. WEINER

Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


DESCRIPTION PAGE

TABLE OF AUTHORITIES....................iii

MEMORANDUM OF POINTS AND AUTHORITIES....................1

I. INTRODUCTION....................1

II. STATEMENT OF FACTS....................3

A. Defendants Banks, Wilson, and Lindsey Proceed to Trial on Five Counts of the FSI....................3

B. Defendant Wilson Recruited Defendant Lindsey and PW-3 to Fly to California to Kill Quando Rondo....................3

C. The Conspirators Stalked Bowman and Saviay'a Robinson on August 18 and 19, 2022....................4

D. The Conspirators Used Cell Phones and Other Interstate Facilities to Engage in Their Stalking and Murder Scheme....................5

E. The Conspirators Murder Saviay'a Robinson....................7

F. The Co-Conspirators Celebrate their Gang Murder....................8

III. ARGUMENT....................9

A. Defendants' Rule 29 Motion Should be Denied....................9

1. Legal Standard for Rule 29 Motion....................9

2. The Evidence Sufficiently Proved Defendants Wilson's and Lindsey's Guilt....................9

3. Defendant Wilson Knowingly Engaged in a Criminal "Course of Conduct" Directed Towards Bowman and Saviay'a Robinson....................11

4. Defendant Wilson and Lindsey Knowingly Agreed to Kill Bowman....................12

5. Defendants are Guilty of Count Two: Stalking of Bowman....................13

6. Defendants are Guilty of Count Three: Stalking of Saviay'a Robinson Resulting in Death....................15

B. Defendant Lindsey's Rule 33 Motion Should be Denied....................17

1. Legal Standard for Rule 33 Motion....................17

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION PAGE


2. The Evidence Sufficiently Proved Defendant Lindsey's Guilt....................................18

3. The Court Properly Joined Defendant Lindsey for Trial............................................18

4. The Court Properly Admitted Certain Evidence Against All Defendants...............................19

a. Exhibits 124 and 125..........................19

b. Exhibit 228...................................20

c. Exhibit 292...................................20

d. Exhibit 201 and PW-1's Testimony Hester........21

5. The Court Properly Rejected Defendant Lindsey's Proposed Jury Instructions..........................22

6. No Cumulative Error Occurred.......................24

IV. CONCLUSION...............................................24

# TABLE OF AUTHORITIES


DESCRIPTION PAGE(S)

**Federal Cases**

Pinkerton v. United States, 328 U.S. 640 (1946) .......... 17

United States v. Ackell, 907 F.3d 67 (1st Cir. 2018) .......... 22

United States v. Alston, 974 F.2d 1206 (9th Cir. 1992) .......... 17

United States v. Archer, 977 F.3d 181 (2d Cir. 2020) .......... 17, 18

United States v. Corona-Verbera, 509 F.3d 1105 (9th Cir. 2007) .......... 9

United States v. Elkins, 725 F. Supp. 3d 570 (N.D. Tex. 2024) .......... 11

United States v. Elkins, 161 F.4th 899 (5th Cir. 2025) .......... 11

United States v. Espino, 892 F.3d 1048 (9th Cir. 2018) .......... 22

United States v. Gonzalez, 905 F.3d 165 (3d Cir. 2018) .......... 23, 24

United States v. Lonich, 23 F.4th 881 (9th Cir. 2022) .......... 24

United States v. Macias-Valencia, 510 F.3d 1012 (9th Cir. 2007) .......... 11, 23

United States v. Marcello, 731 F.2d 1354 (9th Cir. 1984) .......... 18

United States v. Matta-Ballesteros, 71 F.3d 754 (9th Cir. 1995) .......... 23

United States v. Matta-Ballesteros, 98 F.3d 1100 (9th Cir. 1996) .......... 23

United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) .......... 22

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION PAGE

United States v. Nevils,
598 F.3d 1158 (9th Cir. 2010) .................................. 9, 10

United States v. Niebla-Torres,
847 F.3d 1049 (9th Cir. 2017) .................................. 9

United States v. Perez,
116 F.3d 840 (9th Cir. 1997) .................................. 22

United States v. Pimentel,
654 F.2d 538 (9th Cir. 1981) .................................. 17

United States v. Rocha,
598 F.3d 1144 (9th Cir. 2010) .................................. 9

United States v. Ruiz,
710 F.3d 1077 (9th Cir. 2013) .................................. 24

United States v. Segura-Gallegos,
41 F.3d 1266 (9th Cir. 1994) .................................. 20

United States v. Thongsy,
577 F.3d 1036 (9th Cir. 2009) .................................. 22

United States v. Uhlenbrock,
125 F.4th 217 (5th Cir. 2024) .................................. 14

United States v. Yarbrough,
852 F.2d 1522 (9th Cir. 1988) .................................. 20, 21

Zafiro v. United States,
506 U.S. (1993) .................................. 18

**Federal Statutes**

18 U.S.C. § 371 .................................. 23

18 U.S.C. § 2261(b)(1) .................................. 15

18 U.S.C. § 2261A(2) .................................. 11, 23

18 U.S.C. § 2266(2) .................................. 12

**Federal Rules**

Fed. R. Crim. P. 33(a) .................................. 17

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION PAGE

Fed. R. Crim. P. 52(a) .......................................... 22

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Following a multi-week trial, a jury convicted defendants Deandre Wilson and David Lindsey of multiple felony counts, including conspiring to stalk Tyquian Bowman, stalking Bowman with a dangerous weapon, and stalking Saviay'a Robinson resulting in Mr. Robinson's death by gunfire. Among other things, the evidence at trial proved defendants and their conspirators traveled to California to kill Bowman; the conspirators tracked and hunted Bowman and his travel companions --- including Saviay'a Robinson --- as the victims drove to multiple locations in Los Angeles on August 19, 2022; the conspirators used multiple firearms, including a machinegun, to ambush the victims and murder Mr. Robinson at a gas station near Beverly Hills; and that the conspirators celebrated their revenge-based murder in the hours and days following Mr. Robinson's death.

Defendants Wilson and Lindsey filed post-trial motions that primarily argue their convictions should be reversed or a new trial should be granted because: (1) the stalking victims did not know all of the actions the defendants took to hunt and kill the victims, and thus the defendants claim the government did not prove a "course of conduct" within the meaning of the stalking statute; (2) the government purportedly failed to prove that Bowman and Saviay'a Robinson feared for their lives and/or suffered substantial emotional distress; and (3) they claim the evidence was insufficient to prove the conspirators intended to stalk Saviay'a Robinson. These arguments are meritless for multiple reasons.

*First*, defendants' argument that their premeditated --- and largely clandestine --- stalking and murder scheme is not covered by

the federal stalking statute ignores the plain text of the statute and binding caselaw. The statute defines "course of conduct" as a pattern of conduct composed of two or more acts --- none of which needs to be known to the victims. The statute also criminalizes such conduct when it "causes, **attempts to cause, or would be reasonably expected to cause**" substantial emotional distress. Defendants' multi-day stalking and murder scheme that caused Mr. Robinson's death and severe emotional distress to Bowman clearly falls within the scope of the statute.

*Second*, the trial evidence included significant proof regarding the impact of the conspirators' conduct on both Bowman and Mr. Robinson. The government established that three gunmen ambushed the victims with firearms at a gas station; that Mr. Robinson was shot four times, and that other bullets struck near where other passengers were located inside the victims' vehicle; that Mr. Robinson was alive, gasping for breath, and suffering minutes later when first responders attempted to save his life; and that Bowman screamed in agony when he saw Mr. Robinson's injuries. This evidence, coupled with the 911 caller's contemporaneous report showing the emotional impact of the shooting, overwhelmingly proved the fear and emotional distress element for Bowman and Mr. Robinson.

*Third*, a reasonable jury could --- and did --- find that the conspirators intended to stalk Mr. Robinson in addition to Bowman. The evidence proved the conspirators knew Bowman, Robinson, and others were inside the vehicle, and their murder plan involved using a machinegun and other firearms to indiscriminately fire at the victims' vehicle. This and other evidence presented at trial sufficiently established the conspirators' intent to kill, injure,

harass, or intimidate everyone inside of the vehicle, including Mr. Robinson.

For these reasons, and those set forth below, defendants' motions should be denied in full.

## II. STATEMENT OF FACTS

### A. Defendants Banks, Wilson, and Lindsey Proceed to Trial on Five Counts of the FSI

On August 20, 2026, defendants Banks, Wilson, and Lindsey proceeded to trial on Counts Two through Six of the Fourth Superseding Indictment ("Trial One").[1] Consistent with the Court's jury instructions and verdict forms, this Opposition refers to Counts Two through Six of the Fourth Superseding Indictment as Counts One through Five, respectively.

At the conclusion of Trial One, a jury convicted defendants Wilson and Lindsey of three felony counts: conspiracy to stalk Tyquian Bowman (Count One), stalking Bowman with a dangerous weapon (Count Two), and stalking Saviay'a Robinson that resulted in Mr. Robinson's death (Count Three).

The evidence presented at trial established the following:

### B. Defendant Wilson Recruited Defendant Lindsey and PW-3 to Fly to California to Kill Quando Rondo

On November 6, 2020, a close associate of Tyquian Bowman aka "Quando Rondo" shot and killed OTF member Davyon Bennett aka "King Von." Shortly thereafter, multiple OTF members and associates

[1] Based on the defendants' request to sever the VICAR-related charges, a second trial against all defendants is currently set for August 2027 where the defendants will face charges for VICAR murder (Count One of the FSI) and use of firearms, including a machinegun, in furtherance of a crime of violence (Count Seven of the FSI).

plotted to track, find, and kill Bowman in retaliation for Bennett's killing. (See, e.g., 9/1/26 Tr. at 13-19, 22-24; Exs. 206 [CC-4 attempting to locate Bowman following Bennett's death]; 200 [screenshots seized from defendant Banks phone seeking location information for Bowman's associate, T.L.].)

On August 18, 2022, the defendants and other OTF-related conspirators learned that Bowman was visiting Los Angeles. (9/1/26 Tr. at 70-71; 8/26/26 Tr. at 280-81.) Within a few hours that morning, defendants Wilson, Houston, and Lindsey, PW-1, and PW-3, boarded flights from Chicago, Illinois, to San Diego, California. The flights were booked by CC-3 --- a business manager and associate of defendant Banks. (8/24/26 Tr. at 183-84; 8/25/26 Tr. at 31-32; 8/27/26 Tr. at 203-04.)

Flight records, text communications, and witness testimony established that defendant Wilson recruited defendant Lindsey and PW-3 to travel to Los Angeles. (8/31/26 Tr. at 39-46; Ex. 51 [text communications between defendant Wilson and CC-2 related to booking flights for defendants Wilson, Lindsey and PW-3].) According to PW-3, defendant Wilson and another co-conspirator told defendant Lindsey and PW-3 that they would be rewarded by defendant Banks if they agreed to kill Bowman in Los Angeles. (8/31/26 Tr. at 39-46.) Both defendant Wilson and Lindsey agreed to participate in the murder plan and traveled together to Los Angeles in furtherance of the plot.

**C. The Conspirators Stalked Bowman and Saviay'a Robinson on August 18 and 19, 2022**

Defendants Wilson, Lindsey, and Houston, PW-1, and PW-3, traveled from Chicago to San Diego International Airport without any luggage. (Exs. 54, 55, 59.) Once they arrived in San Deigo, a

driver picked them up and drove them to Los Angeles. (Exs. 49 [Grey Transportation Records], 50 [communications between PW-2 and driver].)

On their way to Los Angeles, the co-conspirators stopped at a store to purchase gloves and black clothing to help conceal their identities during the planned murder. (8/26/26 Tr. at 293-94; 8/28/26 Tr. at 131-32.)

While the other co-conspirators traveled to Los Angeles, PW-2 --- who had arrived in Los Angeles earlier that morning with defendant Banks --- obtained guns, ski masks, a fake license plate, and arranged for the delivery of a stolen vehicle for the co-conspirators to use to murder Bowman. (9/1/26 Tr. at 74-76; Ex. 313 [REI Receipt showing the purchase of four black ski masks].)

**D. The Conspirators Used Cell Phones and Other Interstate Facilities to Engage in Their Stalking and Murder Scheme**

At approximately 9 p.m. on August 18, 2022, PW-2 traveled to Bowman's hotel to conduct surveillance and gather information for the co-conspirators' murder plan. (9/1/26 Tr. at 79-81.) Surveillance video from Bowman's hotel shows that PW-2 stayed for approximately 30 minutes. (See Ex. 13 at 1 [surveillance video showing the BMW arrive at 9:06 p.m.], 4 [surveillance video showing the BMW leave hotel at 9:43 p.m.].)

After leaving the hotel, PW-2 traveled to defendant Banks' residence to obtain the murder weapons, including a firearm that had been modified to function as a machinegun. (9/1/26 Tr. at 81-83; 8/25/26 Tr. at 179 [testimony of ATF FEO Bodell].) PW-2 then drove the BMW to meet the other hitmen (defendants Wilson, Lindsey, and Houston, PW-1, and PW-3) near a car dealership in Los Angeles.

(9/1/26 Tr. at 82-85; Ex. 50 at 7.) At that location, an unknown co-conspirator delivered the "hot car" --- the stolen white Infiniti that PW-2 purchased for the murder. The conspirators then used the two vehicles to travel to Bowman's hotel to attempt to murder Bowman. (9/1/26 Tr. at 82-89.) The conspirators lurked outside Bowman's hotel searching for him for almost two hours. (See, e.g., Ex. 13.) While there, the conspirators used cellular phones to communicate with each other. (9/1/26 Tr. at 88-92; 8/26/26 Tr. at 250-51 [PW-1 testifying that majority of conversations with conspirators occurred using Facetime, noting "the FBI, the feds and stuff, can't listen in on FaceTime].) At some point, the co-conspirators saw someone who they believed was part of Bowman's entourage walk outside of the hotel to smoke a cigarette. (9/1/26 Tr. at 88-92.) The co-conspirators left the hotel for the night after concluding that Bowman and his entourage were unlikely to leave the hotel. (Id.; Ex. 13 at 10 [surveillance video showing Infiniti leaving Bowman's hotel at approximately 1:52 a.m. on August 19, 2022].) PW-2 purchased a hotel room for the conspirators to stay for the night before traveling back to defendant Banks' residence. (9/1/26 Tr. at 91-94; Ex. 314.)

At approximately 9 a.m. the following morning, PW-2 and PW-1 traveled in the BMW to Bowman's hotel. (9/1/26 Tr. at 97-98.) After PW-2 and PW-1 saw Bowman "and his entourage" leave the hotel and enter a black Escalade (the "Victim Vehicle"), PW-1 called defendant Wilson or Houston to report that Bowman was on the move. (9/1/26 Tr. at 98-100.) Defendants Wilson, Houston, and Lindsey, and PW-3 then traveled to downtown Los Angeles to help stalk and attempt to kill Bowman. (9/1/26 Tr. at 100-105; Ex. 450 [summary of cellular data

showing defendants following Victim Vehicle for hours on August 19, 2022].)

For hours, the co-conspirators used the BMW and Infiniti to stalk Bowman, Robinson, and the others inside the Victim Escalade.[2] (Id.) Specifically, the co-conspirators followed the victims: (1) from the victim's hotel to a marijuana dispensary located in Downtown Los Angeles; (2) from the marijuana dispensary to a clothing store located on Melrose Boulevard; and (3) from the clothing store to the gas station where the murder occurred.[3]

As the co-conspirators followed the victims across Los Angeles, they used cell phones to discuss their plan to kill Bowman. (See, e.g., 9/1/26 Tr. at 106-08.) For example, the co-conspirators discussed using the BMW to block the Victim Escalade while it was on the freeway while co-conspirators in the Infiniti conducted a drive-by shooting. The co-conspirators also discussed attempting to murder Bowman while he was inside the marijuana dispensary. (9/1/26 Tr. at 105-108.)

**E. The Conspirators Murder Saviay'a Robinson**

At approximately 5:15 p.m., the victims stopped at a gas station located near the Beverly Center. PW-2 and defendant Wilson saw where

[2] The evidence presented at trial established that the co-conspirators were aware that Saviay'a Robinson and others were inside Bowman's vehicle. For example, PW-1 and PW-2 saw Bowman, Robinson, and Bowman's other friends leave their hotel and get into the Victim Escalade. (9/1/26 Tr. at 98-100.) The co-conspirators --- including defendants Wilson and Lindsey --- were also in close proximity to the victims as they entered and exited the Victim Vehicle. (See, e.g., Ex. 13 at 45-52 [surveillance video from clothing store showing co-conspirators' vehicles circling the block and then following the Victim Escalade seconds after the victims left the store].)

[3] The stalking lasted approximately 8 hours, from 9:34 a.m. when the BMW arrived at the victim's hotel until the ambush shooting at the gas station at approximately 5:20 p.m.

the victims stopped, and communicated that information to the conspirators inside the Infiniti. (9/1/26 Tr. at 106-110.) Using their cellular phones, the conspirators decided to commit the murder at the gas station. (Id.) PW-2 drove the BMW to a nearby street where he and defendant Wilson waited while defendant Lindsey and others committed the murder. (Id. at 110-111.)

Defendant Houston then parked the Infiniti in an alley behind the gas station. Defendant Lindsey got out of the vehicle, followed by PW-1 and PW-2. (See, e.g., Ex. 97 [composite of gas station surveillance footage].) The three co-conspirators walked toward the Victim Vehicle and opened fire, striking Saviay'a Robinson multiple times. (Id.) Evidence at trial established bullets also struck areas of the vehicle occupied by other victims, including Bowman. (Ex. 4 at 11, 13, 19 [photographs depicting bullet holes in the driver's door and multiple windows].)

The driver of the Victim Vehicle fled the gas station and drove the vehicle a few blocks away. At that location, first responders arrived and attempted to save Saviay'a Robinson's life. (See Ex. 12.) As first responders removed Mr. Robinson from the vehicle, Bowman appeared distraught, screaming "No, Pab, No." (Id.) Mr. Robinson died a short time later as a result of four gunshot wounds. (8/24/26 Tr. at 103-110.)

**F. The Co-Conspirators Celebrate their Gang Murder**

Approximately 45 minutes after the ambush murder, the co-conspirators traveled to an In-N-Out burger. Before arriving, CC-3 had already booked flights back to Chicago for defendants Wilson, Lindsey, and Houston, PW-1, and PW-3. (Exs. 51 at 4 [defendant Wilson receiving flight confirmation for conspirators at 6:07 p.m.];

312 [Uber records showing conspirators were dropped off at In-N-Out at 6:11 p.m.].) CC-3 sent the flight confirmation for the conspirators' travel to defendant Wilson. (Ex. 51 at 4.)

## III. ARGUMENT

### A. Defendants' Rule 29 Motion Should be Denied

#### 1. Legal Standard for Rule 29 Motion

"The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010). Under Rule 29, a district court may set aside a verdict and enter an acquittal only if, viewing the evidence in the light most favorable to the government, no rational juror could have found the essential elements of the crime beyond a reasonable doubt. United States v. Niebla-Torres, 847 F.3d 1049, 1054 (9th Cir. 2017).

In assessing a Rule 29 motion, the court "cannot second-guess the jury's credibility assessments." United States v. Nevils, 598 F.3d 1158, 1170 (9th Cir. 2010). Relief is appropriate only when the jury's verdict rested on "mere speculation" or where there was a "total failure of proof of [a] requisite element." Id. at 1167. Conflicting evidence must be resolved in favor of the jury verdict, and all reasonable inferences must be drawn in favor of the government and the jury's verdict. United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007).

#### 2. The Evidence Sufficiently Proved Defendants Wilson's and Lindsey's Guilt

When viewing all evidence in the light most favorable to the government, any rational juror could conclude, and in fact 12 jurors did conclude, that defendants Wilson and Lindsey: (i) conspired to

and did stalk Bowman; and (ii) stalked Saviay'a Robinson, resulting in his death, all with the requisite intent to place Bowman and his entourage under surveillance with the intent to kill. While defendants may dispute the weight and credibility of the evidence presented at trial, the resolution of such disputes is the exclusive function of the jury, and the jury resolved those disputes in favor of the government.

The evidence at trial overwhelmingly showed, and the jury agreed, that defendants Wilson and Lindsey knowingly joined a conspiracy to stalk and kill Bowman. Text messages and cooperator testimony showed that defendant Wilson recruited two shooters (defendant Lindsey and PW-3) to join him on the cross-country trip to hunt and murder Bowman. Video surveillance, cell site data, and cooperator testimony showed that defendant Wilson and Lindsey methodically, knowingly, and purposefully placed Bowman and his entourage in the Victim Vehicle, including Mr. Robinson, under surveillance for hours across Los Angeles County, culminating in defendant Lindsey, PW-3, and PW-1 indiscriminately opening fire at the victims. The same evidence also showed that defendant Wilson aided defendant Lindsey's and the other shooters' escape to a celebratory lunch at In-N-Out following the murder, before fleeing back to Chicago using defendant Banks' funds. Based on those facts, defendants have not, and cannot, "point[] to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt," and their Rule 29 motions should be denied in full. Nevils, 598 F.3d at 1169.

### 3. Defendant Wilson Knowingly Engaged in a Criminal "Course of Conduct" Directed Towards Bowman and Saviay'a Robinson

Defendant Wilson's first claim is that the gunfire that killed Mr. Robinson cannot, standing on its own, constitute a "course of conduct" under 18 U.S.C. § 2261A(2). (Wilson Mot. at 12.) Accordingly, he argues, acquittal is required because the conspirators' gunfire was the only conduct that "reached" Bowman and Mr. Robinson. (Id.) Defendant is wrong factually and legally. On the law, defendant's argument ignores the text of the stalking statute, which does not require that a victim be aware of each act constituting the defendant's course of conduct. See United States v. Elkins, 725 F. Supp. 3d 570, 574 (N.D. Tex. 2024), aff'd, 161 F.4th 899 (5th Cir. 2025) ("[C]yberstalking statute also has no textual basis for Defendant's contention that the victim be subjectively aware of each use of a facility of interstate commerce."). Rather, the statute requires only that the "course of conduct" cause a victim's reasonable fear or substantial emotional distress, or ***attempt to*** cause substantial emotional distress. Indeed, that the statute criminalizes attempt proves that the statute does not require the victim be aware of each, or any, act constituting the defendant's "course of conduct." See United States v. Macias-Valencia, 510 F.3d 1012, 1014 (9th Cir. 2007) ("By definition, conspiracy and attempt are inchoate crimes that do not require completion of the criminal objective."). Accordingly, defendant Wilson's argument hinges on a legally faulty premise and should be denied.

On the facts, the evidence plainly showed that defendant Wilson took numerous acts directed towards Bowman and Saviay'a Robinson,

thus "evidencing a continuity of purpose" to further the conspirators' plot to kill Bowman. 18 U.S.C. § 2266(2) (defining "course of conduct"). These acts included defendant Wilson's recruiting of defendant Lindsey and PW-3, flying across the country on defendant Banks' dime, immediately traveling to Bowman's hotel after the co-conspirators obtained guns and the stolen Infiniti, traveling throughout Los Angeles as the conspirators waited for the opportune moment to kill, aiding the shooters flight from the murder scene and travel back to Chicago, and celebrating the death of Mr. Robinson and the distress it caused Bowman. (See, e.g., Ex. 201 [defendant Wilson sharing Instagram messages about the murder]; 118 [CC-3 sending defendant Banks messages about the murder, including the "Quando Rondo Challenge"].) That Bowman and Mr. Robinson only became aware of the course of conduct when three of the conspirators ambushed them at a gas station does not provide a safe harbor for the conspirators' methodical --- and clandestine --- course of conduct targeting the victims and killing Mr. Robinson.

4. Defendant Wilson and Lindsey Knowingly Agreed to Kill Bowman

Defendant Wilson further claims that he should be acquitted of Count One (conspiracy to stalk Bowman) because the government merely proved an agreement to kill Bowman, instead of stalk him. (Wilson Mot. at 16.) Tellingly, defendant does not grapple with the actual text of the statute, which criminalizes a defendant who, with the intent to kill, engages in a "course of conduct" using facilities of interstate commerce. That is precisely what defendant Wilson and his co-conspirators here knowingly agreed to do --- use cars, cell phones, and airplanes to find and kill Bowman.

Likewise, defendant Lindsey claims that the only evidence of his knowing agreement to stalk Bowman was limited to PW-3's testimony about PW-3's conversations with defendant Lindsey. (Lindsey Mot. at 18.) Not so. The evidence of defendant Lindsey's knowing participation included defendant Lindsey traveling with defendant Wilson and PW-3 to California with tickets purchased by CC-3 using defendant Banks' funds; cell site evidence showing defendant Lindsey traveling in tandem with the conspirators in the BMW and the Infiniti to hunt Bowman on August 18 and 19; video surveillance showing defendant Lindsey, PW-1, and PW-3 shooting at Bowman, Mr. Robinson, and the others inside the Victim Vehicle; and defendant Lindsey laughing and celebrating with his co-conspirators, including defendant Wilson, immediately following the murder. (<u>See</u> Ex. 33.) Those facts, in addition to PW-3's testimony about defendant Wilson's recruitment of defendant Lindsey to kill Bowman, establish defendant Lindsey's guilt on Count One.

5. <u>Defendants are Guilty of Count Two: Stalking of Bowman</u>

Defendant Wilson and Lindsey next argue that they should be acquitted of Count Two (substantive stalking of Bowman) because there was no evidence that Bowman was placed in reasonable fear, nor experienced substantial emotional distress. (Wilson Mot. at 12-16; Lindsey Mot. at 22-26.) Defendants' arguments miss the mark on multiple points. First, the claim ignores the uncontroverted video evidence showing (i) a stream of bullets fired directly at Bowman and his entourage in the Victim Vehicle by masked gunmen, including one toting a machinegun; (ii) Bowman and his entourage fleeing the murder scene; (iii) video showing Mr. Robinson in pain and struggling to breath before first responders remove him from the Victim Vehicle;

and (vi) Bowman watching Mr. Robinson bleed to death on the street as first responders attempted to resuscitate him, prompting Bowman to scream in agony. Defendants' claim that such violent conduct directed at Bowman, Mr. Robinson, and the others inside the Victim Vehicle, did not result in "reasonable fear" or "substantial emotional distress" to Bowman strains credulity and fails under the weight of the overwhelming evidence presented at trial. Indeed, as the 911 caller made clear in her contemporaneous report of the crime, "someone was shot at the gas station," she saw "blood squirting everywhere," and she refused to leave her information because of the fear the conspirators caused by their murderous conduct. (Ex. 1 ["I don't want to leave any information, I don't want to be a part of this"].)

Citing to United States v. Uhlenbrock, defendant Wilson claims that he is factually innocent of stalking because "[t]he conduct here was built not to be found, and no one found it." (Wilson Mot. 15.) But Uhlenbrock does not stand for the proposition that clandestine acts directed toward a victim are not criminal; rather, that case held that a jury had sufficient evidence to conclude the defendant intended to harass his ex-girlfriend by posting nude images in a forum online, even though the victim did not see the posts until she was alerted to the posts and searched for them on the internet. 125 F.4th 217, 226 (5th Cir. 2024). The court reasoned that sufficient evidence supported the stalking conviction, as the defendant had previously posted "her nude media in prior years," which the victim discovered and suffered humiliation and fear as a result. Id. Accordingly, a "rational jury could conclude that he expected that she would also learn about his" charged posts. Id. So too here. Of

course, defendants knew and intended for their conduct to result in death --- a result that plainly would cause reasonable fear of death or substantial emotional distress to the victim. Defendant Wilson's false equivalency that conduct which *could* be charged as murder cannot constitute federal stalking (Wilson Mot. at 16) is belied by 18 U.S.C. § 2261(b)(1), which expressly contemplates that conduct intended to kill --- including murder --- is encompassed by the stalking statute because it explicitly provides an increased penalty for *stalking that results in death*. That the conspirators' days-long surveillance and following of Bowman went undetected does not undermine the jury's reasonable, rational verdict that they engaged in a criminal course of conduct, culminating in a brazen murder and an attempted murder, which both attempted to cause Bowman substantial emotional distress, and caused him substantial emotional distress and placed him in reasonable fear of death.[4]

6. <u>Defendants are Guilty of Count Three: Stalking of Saviay'a Robinson Resulting in Death</u>

Defendant Wilson and Lindsey also claim they should be acquitted of Count Three because none of their conduct was directed towards Mr. Robinson. (Wilson Mot. at 17-20; Lindsey Mot. at 8-18.) The claim should be rejected for two reasons.

First, the evidence showed that defendants Wilson and Lindsey engaged in conduct purposefully directed at Bowman *and* his entourage in the Victim Vehicle, including Mr. Robinson. On August 19, the

[4] Defendant Wilson also appears to claim that shooting a victim as the final act in a stalking course of conduct can either be (i) a fact that goes to the course of conduct element; or (ii) a fact that goes to an <u>Apprendi</u> finding of using a dangerous weapon or death, but not both. (Wilson Mot. at 18.) That claim has no basis in the text of the statute, and should be rejected out of hand.

conspirators knowingly and purposefully followed Bowman's entire entourage for hours, culminating in the shooters indiscriminately spraying gunfire at all of the victims. While the conspirators may not have known Mr. Robinson's name, the evidence proved that they nonetheless knew there were multiple people traveling with Bowman in the Victim Vehicle, and placed everyone in that car under surveillance with the intent to kill any of them, and at minimum intimidate all of them. Indeed, as the conspirators stalked their victims for hours across Los Angeles, they discussed ambushing *all of the victims* inside the Victim Vehicle. For example, PW-2 testified that he told the conspirators:

> I gave the idea ... we should box **them in** on the freeway. We know that **they** are going to ride in the left-hand lane, the fast lane. At that time it was almost traffic time ... [s]o I felt that it would be easier for us just to box them in on the side and just light the truck up and go from there.

(9/1/26 Tr. at 105 (emphasis added).) The conspirators' discussions about how to conduct the shooting, coupled with the use of a machinegun and indiscriminate fire at the gas station, is evidence sufficient for the jury to find the requisite intent for Count Three, namely, the intent to kill, injure, harass, or intimidate Saviay'a Robinson.

Second, defendants' argument ignores that the jury may have convicted defendants under an aiding and abetting or Pinkerton theory of liability. As described below, the evidence overwhelmingly supports the jury's finding that both defendants knowingly joined a years-long conspiracy to kill Bowman. In furtherance of that conspiracy, the defendants and their conspirators knowingly surveilled and followed Bowman *and* his entourage around Los Angeles,

waiting for an opportunity to ambush the vehicle and kill Bowman. Based on those facts, a rational juror could have well-found that any one of the conspirators possessed the requisite intent as a principal for the stalking of Mr. Robinson, and that the stalking of Bowman's entourage in the Escalade (including Mr. Robinson) fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement to stalk and kill Bowman. Pinkerton v. United States, 328 U.S. 640 (1946).

**B. Defendant Lindsey's Rule 33 Motion Should be Denied**

1. Legal Standard for Rule 33 Motion

Rule 33 provides that "upon the defendant's motion, a court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Because a verdict is presumptively valid, a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up). The Court may set aside a verdict only where "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." United States v. Alston, 974 F.2d 1206, 1211-12 (9th Cir. 1992).

Although the Rule 33 analysis does not require the same level of deference as Rule 29, the "exceptional" nature of the Rule 33 remedy requires a court take great care in assessing the evidence. A reviewing court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (cleaned up). Indeed, "a district court may not grant a Rule

33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." Id.

2. The Evidence Sufficiently Proved Defendant Lindsey's Guilt

Defendant Lindsey argues he should receive a new trial based on insufficient evidence showing his guilt on all counts. (Lindsey Mot. at 30.) For the reasons stated in Section III.A, the evidence sufficiently proved defendant Lindsey's guilt.

3. The Court Properly Joined Defendant Lindsey for Trial

Defendant Lindsey also requests a new trial, claiming he was improperly tried with his co-conspirators. (Lindsey Mot. at 32.) As the Court previously reasoned in rejecting defendant Lindsey's pretrial motion to sever, "the nature of the charges is such that the vast majority of evidence would be admissible against each defendant in separate trials, which counters against severance." Dkt. 386 at 3 (citing Zafiro v. United States, 506 U.S. 534, 540 (1993) ("[A] fair trial does not include the right to exclude relevant and competent evidence."). And the evidence at trial bore that out, showing that defendant Lindsey knowingly joined the conspiracy to stalk and kill Bowman. See Section III.A.6. A majority of the trial exhibits --- including surveillance clips, travel records, and text messages discussing the conspirators' intent and plan to seek revenge for Bennett's death, were properly admitted as to all trial defendants. United States v. Marcello, 731 F.2d 1354, 1360 (9th Cir. 1984) ("Joint participation in a criminal activity generally means a joint indictment and a joint trial."). Moreover, the Court gave multiple admonishments to the jury that certain evidence was admitted for a

limited purpose. (See, e.g., 8/25/26 Tr. at 234 (admonishing jury about the limited purpose of gang-related evidence); 8/31/26 Tr. at 50 (admonishing jury that certain statements were not admissible against defendant Lindsey); 8/27/26 Tr. at 89-91 (broad admonition about limited nature of Exhibit 238, including instructing jury that "[n]one of the defendants is on trial for anything which is not alleged in the indictment. They are on trial only for the crimes which are alleged in the indictment. And you should keep that in mind. That is the reason that you are hearing this evidence, just as you've heard evidence of certain gang affiliations for a very narrow, limited purpose. I've told you that many times.").)

4. The Court Properly Admitted Certain Evidence Against All Defendants

Defendant Lindsey further claims that certain pieces of evidence were erroneously admitted against him, or that the Court erred in not providing certain limiting instructions. (Lindsey Mot. at 34-37.) As described below, the Court properly admitted the below exhibits against defendant Lindsey, and the lack of certain limiting instructions does not require a new trial.

*a. Exhibits 124 and 125*

Exhibits 124 and 125 were properly admitted against defendant Lindsey as co-conspirator statements, and no limiting instruction was necessary. Exhibit 124 was a November 2020 text exchange between defendant Banks and CC-3 in which defendant Banks' admitted his intent to "get back" at Bowman in the weeks following Bennett's killing --- a clear co-conspirator statement in furtherance of the conspiracy to seek revenge and stalk Bowman. As the Court reasoned with similar exhibits --- e.g., Exhibit 206 showing CC-4's attempt to

get Bowman's location in November 2020 (Dkt. 605 at 3-4) --- statements in furtherance of the conspiracy to stalk Bowman were likewise admissible against later-joined participants. United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988); United States v. Segura-Gallegos, 41 F.3d 1266, 1272 (9th Cir. 1994) ("[I]t does not matter that there was no evidence of Segura-Gallegos' participation in the conspiracy before October 4. Statements of his coconspirators are not hearsay even if they were made before Segura-Gallegos entered the conspiracy.").

Likewise, Exhibit 125 was a co-conspirator statement following Mr. Robinson's death, with defendant Banks rejecting a peace offering and reiterating his intent that "Quando can die." As the Court reasoned with Exhibit 208, 215, and 216, Exhibit 125 was admissible against defendant Lindsey because it showed that the conspiracy to kill Bowman post-dated the August 2022 murder, and kept "coconspirators abreast of an ongoing conspiracy's activities" to avenge Bennett's death. Dkt. 605 at 4; Yarbrough, 852 F.2d at 1536.

*b. Exhibit 228*

Contrary to defendant Lindsey's argument, the Court did instruct the jury that Exhibit 228 was not being admitted against defendant Lindsey. (8/27/26 Tr. at 91-92 [Court instructing the jury that "this whole exchange that you are hearing is simply not evidence of any sort against Mr. Lindsey. It's just not relevant to him, his guilt or innocence, in any way."].)

*c. Exhibit 292*

For the same reasoning that the Court did not err in admitting Exhibit 125 against defendant Lindsey, Exhibit 292 was properly admitted as a co-conspirator statement with no limiting instruction.

That exhibit was a jail call between CC-5 (the individual who recruited PW-1 to travel to Los Angeles) and another individual celebrating and mocking the death of S.R. Such admissions were intended to keep "coconspirators abreast of an ongoing conspiracy's activities" to avenge Bennett's death, and were therefore admissible against all trial defendants. Dkt. 605 at 4; Yarbrough, 852 F.2d at 1536.

*d. Exhibit 201 and PW-1's Testimony Hester*

Finally, to the extent defendant Lindsey claims that the Court erred in not providing a limiting instruction following the admission of Exhibit 201 (Instagram messages sent by defendant Wilson) and/or PW-1's testimony that defendant Banks admitted "that's the [PW-1] I been waiting on," the claims are meritless. First, Exhibit 201 is an excerpt of Instagram messages that defendant Wilson sent to other OTF members after the conspirators killed Mr. Robinson. Nothing in the text messages reference defendant Lindsey, nor is there any inference the jury could draw from the messages that would prejudice defendant Lindsey, particularly given the Court's thorough and repeated admonishments about the limited purpose of certain evidence during voir dire and throughout the trial.

Under substantially the same reasoning, defendant Lindsey's argument about PW-1's testimony also fails. The testimony did not involve defendant Lindsey and, as noted above, the Court repeatedly instructed the jury about the limited nature of gang-related evidence. The argument also fails because the Court later struck the disputed testimony and instructed the jury to disregard it. (8/26/26 Tr. 241:4-19.)

5. The Court Properly Rejected Defendant Lindsey's Proposed Jury Instructions

Defendant Lindsey raises three jury instruction-related claims, all of which should be rejected out of hand.

First, the Court was correct in rejecting defendant Lindsey's legally erroneous "specific unanimity" instruction on the "course of conduct" element for the substantive stalking offenses in Counts One and Two. (Lindsey Mot. at 37.)[5] The Court, applying the reasoning of Richardson v. United States, correctly instructed the jury that "[y]ou are not required to agree unanimously on which two or more acts constitute the course of conduct." (Dkt. 652 at 25, 32.) The Court's reasoning and conclusion was consistent with out-of-circuit authority, and defendant's argument should be denied. See United States v. Ackell, 907 F.3d 67, 70 (1st Cir. 2018) (specific unanimity

[5] A Rule 33 motion may be granted for failure to give proper jury instructions, but an instructional error does not automatically warrant a new trial because a defendant must show that the error affects substantial rights. See Fed. R. Crim. P. 52(a); United States v. Miller, 953 F.3d 1095, 1103 (9th Cir. 2020). "[A]n error in misdescribing or omitting an element of the offense in a jury instruction is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." United States v. Thongsy, 577 F.3d 1036, 1043 (9th Cir. 2009) (cleaned up).

When applying this standard, a court should consider "the jury instructions and the trial record as a whole." United States v. Espino, 892 F.3d 1048, 1053 (9th Cir. 2018). Where the evidence presented at trial and "other language in the jury instructions" assures the court that the jury could not have based its verdict on the erroneous language in the instruction, the Ninth Circuit has found the error to be harmless. Miller, 953 F.3d at 1103; United States v. Perez, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not specifically mentioned [in the jury instructions], it remains possible the jury made the necessary finding.").

instruction not required for "course of conduct", as "[n]othing in § 2261A(2)(B)'s text indicates that the acts comprising the "course of conduct" are themselves elements"); United States v. Gonzalez, 905 F.3d 165, 183 (3d Cir. 2018) (same, and explaining that "[t]he focus is not on the individual acts as separate, distinct events, but instead on the purpose and scope of the defendants' pattern of stalking conduct as a whole.").

Second, defendant Lindsey reiterates his objection that 18 U.S.C. § 2261A(2)(B) does not require the government to prove the "subjective awareness" of the victim. (Lindsey Mot. at 39.) As the Court already ruled, the "substantial emotional distress" alternative means does not require the victim's subjective awareness, as the statute plainly criminalizes a defendant's *attempt*. See 18 U.S.C. § 2261A(2)(B) (criminalizing a defendant's "attempt[] to cause [] substantial emotional distress" to a victim); United States v. Macias-Valencia, 510 F.3d 1012, 1014 (9th Cir. 2007) ("By definition, conspiracy and attempt are inchoate crimes that do not require completion of the criminal objective.").

Third, the Court should again reject defendant Lindsey's claim that the Court improperly instructed the jury that Pinkerton liability applied based on Count One (conspiracy to commit stalking) to Counts Two (stalking of Bowman) and Three (stalking of Mr. Robinson). See, e.g., United States v. Matta-Ballesteros, 71 F.3d 754, 772 (9th Cir. 1995), opinion amended on denial of reh'g, 98 F.3d 1100 (9th Cir. 1996) ("Matta-Ballesteros's contention that he would be subject to a lesser sentence if the jury convicted him of conspiracy under 18 U.S.C. § 371 ignores the holding in Pinkerton [] which makes conspirators liable for every substantive offense

committed in furtherance of the conspiracy."); see also United States v. Gonzalez, 905 F.3d 165, 190 (3d Cir. 2018) (district court properly instructed jury on Pinkerton liability for § 371 count with stalking predicate).

6. No Cumulative Error Occurred

Defendant Lindsey raises a final catch-all argument that the purported errors should be viewed collectively, and thus require a new trial. (Lindsey Mot. at 40.) As explained above, no errors occurred. "[B]ecause none of defendants' arguments demonstrate error, the cumulative error doctrine does not apply." United States v. Lonich, 23 F.4th 881, 907 n.5 (9th Cir. 2022). And even if the isolated errors were errors at all, they did not prejudice defendant as substantial evidence proved his guilt. See United States v. Ruiz, 710 F.3d 1077, 1080 n.1 (9th Cir. 2013) (no basis for reversal were errors were isolated and did not prejudice defendant).

**IV. CONCLUSION**

The Court should deny defendants' motions in full.