CRAIG A. HARBAUGH (Bar No. 194309)
HARBAUGH LAW, PC
360 E. 2nd Street, Suite 800
Los Angeles, California 90012
Tel: (213) 986-8656
Email: craig@harbaugh.law

Attorney for Defendant
DEANDRE WILSON

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DURK BANKS, *et al.*,<br>*Defendants.* | No. 2:24-cr-621-MWF-2<br><br>**DEFENDANT DEANDRE WILSON'S REPLY IN SUPPORT OF EX PARTE APPLICATION FOR AN ORDER DIRECTING THE GOVERNMENT TO CORRECT FALSE TESTIMONY AND FOR AN ADVERSE JURY INSTRUCTION FOR NAPUE AND BRADY VIOLATIONS**<br><br>Hearing Date: October 28, 2026<br>Hearing Time: 2:00 p.m.<br>Courtroom: 5A |

Defendant Deandre Wilson, by and through his counsel of record, Craig A. Harbaugh, submits this reply in support of his ex parte application under *Brady* and *Napue* and in response to the government's opposition, ECF No. 733. The reply is based on the attached Memorandum of Points and Authorities, the Supplemental Declaration of Craig A. Harbaugh and Exhibit L, the trial record, the records and files in this case, and any further argument the Court may permit.

Dated: October 21, 2026

Respectfully submitted

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH
Attorney for Deandre Wilson

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................ 1

II. ARGUMENT ........................................................................................... 3

A.The Opposition Adopts Three Propositions From the September 4 Hearing, and Each Misstates the Law. ........................................................ 3

B.The Government's Own Notes Listed Murdaman and Dede as Separate People the Morning It Played the Video. .................................................... 7

C.The Comments Undermined the Only Basis on Which the Government Offered the Video. ........................................................................... 9

D.Declining To Replay the Video Does Not Defeat Prejudice.................. 10

E.Hester's Denials Contradict the Government's Own File, and the Government Left Them Uncorrected. ....................................................... 12

F.If the Court Denies Rule 29 Relief, the Violations Warrant a New Trial on the Counts of Conviction......................................................................... 14

III. CONCLUSION...................................................................................... 16

# TABLE OF AUTHORITIES

## CASES


*Banks v. Dretke*,
540 U.S. 668 (2004) .......... 4

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 1, 5

*Comstock v. Humphries*,
786 F.3d 701 (9th Cir. 2015) .......... 4, 5

*Gantt v. Roe*,
389 F.3d 908 (9th Cir. 2004) .......... 6

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) (en banc) .......... 13, 14

*Kyles v. Whitley*,
514 U.S. 419 (1995) .......... 7

*Milke v. Ryan*,
711 F.3d 998 (9th Cir. 2013) .......... 3

*Napue v. Illinois*,
360 U.S. 264 (1959) .......... 1, 13

*Strickler v. Greene*,
527 U.S. 263 (1999) .......... 5

*United States v. Agurs*,
427 U.S. 97 (1976) .......... 7

*United States v. Alvarez*,
86 F.3d 901 (9th Cir. 1996) .......... 5, 6

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) .......... 11

*United States v. Cloud*,
102 F.4th 968 (9th Cir. 2024) .......... 4, 5, 6, 7, 11, 12, 14, 15

*United States v. Davenport*,
753 F.2d 1460 (9th Cir. 1985) .......... 7

*United States v. Garrison*,
888 F.3d 1057 (9th Cir. 2018) .......... 14

*United States v. Olsen*,

704 F.3d 1172 (9th Cir. 2013) ........ 6
*United States v. Price*,
566 F.3d 900 (9th Cir. 2009) ........ 6, 14
*United States v. Renzi*,
769 F.3d 731 (9th Cir. 2014) ........ 12
*United States v. Safavian*,
233 F.R.D. 12 (D.D.C. 2005) ........ 5

**RULES**

Fed. R. Evid. 103(b) ........ 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The government's opposition[1] to Wilson's application under *Brady* and *Napue*[2] rests on three propositions. First, the YouTube copy of Government Exhibit 164, a video of Wilson's Instagram Live broadcast, was publicly available, so the government could not have suppressed it. Second, the viewer comments on that copy were not exculpatory. Third, Kacey Hester, the government's central cooperating witness, gave honestly mistaken answers, not false testimony.

The government's own statements and records defeat all three. *First*, public availability did not relieve the government of its duty to disclose the YouTube copy. That proposition began as the Court's tentative view at the September 4 hearing, offered after government counsel had conceded that the possession element "would meet that standard."[3] The opposition now concedes that public availability does not, "in and of itself," defeat suppression.[4] The government's trial counsel told the Court that the government saw the YouTube copy on August 19, 2026, five days before it offered the video as Wilson's confession.[5] The government disclosed the copy only after the jury had watched the video. A prosecutor who believed the comments offered the defense nothing would not have sent them at all. Holding them until after the video was admitted and played, and only then disclosing them, underscores the government's awareness of their value.[6] After abandoning its claim that defense counsel knew of the YouTube copy, the opposition implies that counsel had a general idea of comments he

[1] Government's Opposition to Defendant Deandre Wilson's Ex Parte Application (Opp.), ECF No. 733.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959).

[3] 12RT 90:12, 90:19-20, 96:13.

[4] Opp. 11:23-25.

[5] 12RT 86:13-19 (Sept. 4, 2026, Volume XII); 3RT 171:11-14; Ex. E.

[6] Ex. E; 12RT 86:13; 5RT 315:8-10; 12RT 98:1-2.

had never seen.[7] An Instagram Live broadcast does not post itself to YouTube. A viewer recorded this one and uploaded it.[8]

*Second*, the comments were favorable to Wilson. The government offered the video on one basis: that Wilson called himself a murder man. At sidebar, its own counsel acknowledged that the government had the comments and that "there was someone else there named Murder." The Court found that "the comments undermine the basis for the admission of the video" and struck it on the last court day before closing argument.[9] The jury had watched the video nine days earlier. There was no way to unring the bell.

*Third*, Hester's answers were not honest mistakes. He denied on cross-examination telling the FBI what the government's own report shows he told them. He also insisted that a detail absent from everything the government has produced, across four years of cooperation and more than thirty meetings with the government, was something he had always said.[10] The government did not correct him. On redirect, AUSA Michael Morse used two FBI reports to rehabilitate Hester's account that Wilson said, outside the Level Hotel, that they could get Quando Rondo right there. He did not do the same for Hester's claim that Wilson grabbed the Beretta out of Hester's hand and pointed it at the window. No report the government has produced says that.[11]

The jury's verdict on September 11, 2026 ended the trial. It did not end these violations. If the Court denies Wilson's Rule 29 motion, it should find both violations and order a new trial on the counts of conviction.

---

[7] Ex. H; Opp. 4:12-14, 10:10-12, 11:3-6.
[8] Opp. 10 n.6.
[9] 5RT 315:8-13; 12RT 93:3-6, 95:18-19, 98:1-2.
[10] 7RT 133:10-17, 121:2-12 (Aug. 28, 2026, Volume VII); 5RT 136:7-10 (Special Agent Farmby: approximately 31 meetings); 7RT 14:17-20.
[11] 7RT 150:15-152:1, 118:4-119:4.

## II. ARGUMENT

### A. The Opposition Adopts Three Propositions From the September 4 Hearing, and Each Misstates the Law.

The opposition's three answers on *Brady* trace to the September 4 hearing, and each began with the Court, not the government. Asked for its legal analysis of whether a video "known to the whole world" satisfied *Brady*'s possession element, government counsel answered that "it does seem as if, yes, it would meet that standard. The Government did know about it." 12RT 90:11-21. The Court declined the concession: "No, it's on a publicly available YouTube, and anybody could find it who wanted to look, and you just happened to find it. . . . I'm not going to make the Government's argument for it. I just thought that that couldn't possibly be Brady because anybody could find it who wanted to look." *Id.* at 90:22-91:2. Only then did government counsel adopt the point: "the facts here are exactly as the Court put it." *Id.* at 91:7-11. The Court then added two more conditions: that *Brady* material be "clearly exculpatory," and that the government have acted in "bad faith." *Id.* at 91:12-18, 94:6-7. The opposition now returns that colloquy to the Court as a ruling: "As the Court has already determined in its tentative ruling, defendant's claims are meritless." Opp. 1:12-14. It builds on all three: that public availability defeats suppression because Wilson had "equal access" to the YouTube video, Opp. 11:19-12:8; that the comments are "not exculpatory," *id.* at 7:22-23; and that the government's "good faith interpretation" forecloses a violation, *id.* at 12:16-18. Each misstates the law.

Public availability does not defeat suppression. The Court invited correction: "If you are telling me the law is more generous to the defense than my understanding, then I'll accept that, obviously, if it's the Government that is telling me that." 12RT 91:3-5. The government has now told the Court exactly that, twice. At the hearing, it said the possession element "would meet that standard." *Id.* at 90:19-20. In its opposition, it concedes that "mere presence of evidence in the public record does not defeat a Brady suppression claim in and of itself." Opp. 11:23-25 (citing *Milke v. Ryan*, 711 F.3d 998,

1017 (9th Cir. 2013)). That concession is the law. Public availability "doesn't diminish the state's obligation to produce" favorable evidence, *Milke*, 711 F.3d at 1017, because a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

After abandoning its claim that defense counsel knew of the YouTube copy, the opposition implies that counsel had a general idea of comments never seen. The government's first written statement of its position said counsel "was aware of the public YouTube video prior to the August 18, 2026 pretrial conference." Ex. H. Counsel answered that he "had not seen the comments until Mr. Morse identified them to me." *Id.* The government replied, "Based on your representation below, we have modified our position," and removed the sentence. *Id.* What the opposition has left is that counsel knew the video showed Wilson "referring to comments." Opp. 10:10-12 (quoting 8/18/26 RT 62:12-16); *see id.* at 4:12-14, 11:3-6. Knowing that a broadcast drew comments is not knowing where to find them. An Instagram Live broadcast does not post itself to YouTube. A viewer recorded this one and uploaded it, and the government's own warrant return from Instagram did not include it. Opp. 10 n.6; *see* 12RT 80:15-17 ("I didn't even know that that was a thing, that you post something on Instagram, and then somebody puts it on YouTube as well.").

The government's remaining answer is that it saw the video on August 19 but "did not make the connection that Mr. Harbaugh is proposing here." 12RT 86:13-15; *see* Opp. 4:15-19. That is a claim of inadvertence. Inadvertence is not a defense. Evidence is suppressed when it is "known to the government but not disclosed to the defendant." *United States v. Cloud*, 102 F.4th 968, 976 (9th Cir. 2024). The duty attaches when the government has the evidence, not when it appreciates what the evidence shows: "Once the prosecutor acquires favorable information, even if she 'inadvertently' fails to communicate it to the defendant, evidence has been suppressed." *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015).

Nor is *Brady* limited to evidence that is "clearly exculpatory." The Court described *Brady* material this way: "it's something like the witness just says, 'Oh, I didn't see -- I didn't see defendant A shoot the gun. I saw defendant B shoot the gun.' I mean, it's something at that level. It's not just any little thing that might be helpful to the defense." 12RT 91:13-18. The opposition carries that standard forward when it calls the comments "not exculpatory." Opp. 7:22-23. The Ninth Circuit asks a different question. "[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable." *Comstock*, 786 F.3d at 708. For evidence that surfaces during trial, the government's own authority asks "whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." *Cloud*, 102 F.4th at 979 (internal quotation marks and citation omitted); *see* Opp. 13:6-10. If it is, "it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." *Cloud*, 102 F.4th at 979 n.10 (quoting *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005)). The government's disagreement with what the evidence means does not narrow that definition. It "is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false" or has diminished probative value. *Id.* at 977 (quoting *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996)). Comments that, in the Court's own words, "undermine the basis for the admission of the video," 12RT 98:1-2, are favorable by any measure.

Nor does a violation require bad faith. The Court said that "there also has to be bad faith. I'm just not seeing the bad faith." 12RT 94:6-7. The opposition repeats the point when it defends the government's "good faith interpretation." Opp. 12:16-18. *Brady* itself holds otherwise: suppression violates due process "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The evidence need only be suppressed "either willfully or inadvertently." *Strickler v. Greene*, 527 U.S. 263,

282 (1999). The Ninth Circuit applies that rule without exception. An "'innocent' failure to disclose favorable evidence constitutes a Brady violation nonetheless." *United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009). "Brady has no good faith or inadvertence defense." *United States v. Olsen*, 704 F.3d 1172, 1182-83 (9th Cir. 2013) (quoting *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004)).

Even assuming the government missed the connection on August 19, it had made the connection by August 26. That morning, before it played the video, the government went over it with Hester. Ex. C; 5RT 199:17-19. At sidebar that afternoon, government counsel acknowledged a second person named Murder, then added, "That is not our understanding of what Mr. Wilson was referring." 5RT 315:12-13, 315:19-20. That is the disagreement *Cloud* and *Alvarez* hold cannot justify withholding. By September 4, the government had moved further still: it "is not -- is not disclaiming and saying that is a farcical interpretation." 12RT 86:15-16. An interpretation the government cannot call farcical is favorable evidence, and the government held it until after the jury had seen the video.

If a video "known to the whole world," 12RT 90:12, imposed no duty to disclose, and its comments were "not even exculpatory," *id.* at 96:13, the government had no reason to send them to the defense. It sent them anyway: "Please see the below YouTube link regarding Exhibit 164." Ex. E. It also chose when. The government found the video on August 19. 12RT 86:13. It moved the video into evidence on August 24, 3RT 171:11-14, and played it for the jury on August 26 without disclosing the comments. That afternoon, government counsel told the Court, "we actually have the comments, but that is not the version." 5RT 315:9-10. The link arrived at 10:05 that night, after the jury had seen the video and more than five hours after the government told the Court it had the comments. Ex. E. Twenty-four minutes later, defense counsel asked when the prosecution team first learned of the comments. Ex. F. The government did not answer. It disclosed the August 19 date a week later, in correspondence about Wilson's forthcoming motion. Ex. H.

The law required disclosure before the jury saw the video, not after. "[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). And "[d]isclosure, to escape [a] Brady sanction, must be made at a time when the disclosure would be of value to the accused." *Cloud*, 102 F.4th at 976 (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)). The government disclosed only after the one event timely disclosure could have prevented: the jury watching the video on a basis the comments, by the Court's own finding, "undermine." 12RT 98:1-2. For all its insistence that nothing was owed, the opposition's prejudice argument rests on that same disclosure, which it says arrived "on the same day that Exhibit 164 was published." Opp. 13:25-27. A disclosure made the same day the jury saw the exhibit, but only after it saw it, is the timing problem, not its cure. The Court should find that the government suppressed the comments.

**B. The Government's Own Notes Listed Murdaman and Dede as Separate People the Morning It Played the Video.**

The government's own notes show that it knew Murdaman and Dede were two different people before it played the video. On the morning of August 26, an FBI agent met with Hester and took notes, which the government produced at 8:44 a.m. Opp. 6 n.3; Ex. C. Under the heading "Ex 164 Video," the agent listed the people associated with the video. Murdaman and Dede appear as separate names. Ex. C. The opposition now relies on those notes to argue that the defense understood, "at least by the time the exhibit was shown to the jury that 'Murdaman' was another gang member present in Exhibit 164." Opp. 11:4-6. Whatever the notes told the defense, they told the government first. The government wrote them. That afternoon it played the video, and at sidebar it maintained that Wilson said, "They are saying DeDe is a murder man, for sure that." 5RT 315:10-11.

The opposition says the defense could have raised Wilson's reading at two points: before trial, when Detective Carias sponsored the exhibit on August 24, or

during Hester's testimony. Opp. 10:20-11:2. Before trial, the defense had no comments to raise. The government found them on August 19, the day after the pretrial conference at which the Court admitted the video. 12RT 86:13, 93:2-6. On August 23, the day before Carias testified, defense counsel asked the government to confirm the exhibit was not coming in through Carias, flagged Rule 106, and raised "the need for a transcript to assist the jury." Ex. G. The government answered that Carias would admit the exhibit but "will not display or discuss the exhibit." *Id.* With the video neither displayed nor discussed, there was nothing to examine Carias about. The notes listing Murdaman arrived two minutes after court resumed on the day Hester took the stand. Ex. C; 5RT 20:1-8, 172. That afternoon, the government played the video through Hester, a witness it never showed was present for the broadcast, and asked him what its language meant. 5RT 199:17-203:25. He explained "pop out" and "send that lo." *Id.* at 202:5-203:2. The government did not ask him about the line it had told the Court was a confession. 5RT 315:13-16.

No transcript accompanied the video. The government explained why: "some of it we can't really credibly make out, and so we didn't want to potentially tilt the scales either way." 5RT 316:19-23. Even accepting that explanation, it confirms what the comments were worth. The government judged the audio too unclear to transcribe, and it held the comments that showed what Wilson was reading when he spoke. *Id.* at 315:9-10. The defense had the unclear audio and nothing else.

The opposition's other source for defense knowledge is a statement it attributes to counsel: that counsel "was aware of Mr. Wilson's alternative explanation" and "later told the Court" it was not his burden to share it. Opp. 10:13-17 (citing 12RT 87:2-5). Counsel did not say that to the Court. The words are AUSA Daniel Weiner's account, at the September 4 sidebar, of a conversation among counsel "after court on September 2nd." 12RT 86:21-87:5. Instead, defense counsel "had questions as to whether it said that, but I had no evidence to refute it." 12RT 81:2-3. A question about what Wilson said is not possession of the comments that answered it.

### C. The Comments Undermined the Only Basis on Which the Government Offered the Video.

The government offered the video for one purpose. It told the Court on August 18: "So our position is he took credit for killing [S.R.]." Opp. 4:8 (quoting 8/18/26 RT 64-65). The Court admitted the video on that basis alone, "that a rational jury could conclude -- not necessarily would conclude, but could conclude that there had been the reference to murder man." 12RT 93:3-6. The affiliation rationale the opposition now invokes, Opp. 9 n.5, did not come from the government. It came from the Court: "[H]ad I been asked to show, for reasons that I have put forth in writing, why that video would have been admissible to show Mr. Wilson's affiliation with OTF/Black Disciples, . . . I almost certainly would have granted that. But that, frankly, is not what the Government asked me to do." 12RT 93:15-20; *see id.* at 97:19-21. The government did not ask for it, as the Court itself observed. The opposition now borrows it. A basis no party offered cannot justify, after the fact, an admission the jury received as a confession.[12]

The government's own counsel identified the problem with that basis at sidebar: "Mr. Wilson looks down at a comment from Instagram Live -- we actually have the comments, but that is not the version -- and he says, 'They are saying DeDe is a murder man, for sure that.' So that is clear. Apparently there was someone else there named Murder, like, another gang member." 5RT 315:8-13. In the same breath that he

---

[12] Nor would an affiliation rationale have tied the video to the charged conspiracy. Hester identified the location as Tay Town and the people with Wilson as Black Disciples. 5RT 201:19-202:4. He did not identify Banks or anyone else alleged to have joined the conspiracy. *See id.* at 199:17-203:25. The Court instructed the jury that this kind of evidence came in to show "links among the alleged co-conspirators" and motive. *Id.* at 198:15-21. Wilson's presence in Tay Town says nothing about allegiance to Banks. Whatever connection the government drew between Banks and Tay Town came from a different exhibit, *id.* at 195:22-196:15, not from the video. The only part of the video bearing on S.R.'s killing was the line the government offered it for.

defended the exhibit, Morse acknowledged that the government had the comments and that someone else named Murder was there.

The opposition no longer argues that Wilson's reading is wrong. It accepts that a viewer's comment reads "Dede and murdaman," and that on Wilson's reading he said, "They talking about Dede and Murdaman, for sure that." Opp. 8:7-14. It argues instead that the jury "could have reasonably concluded" Wilson admitted his role "based on the government's interpretation of what defendant said or defendant's alternative interpretation," because on Wilson's reading he "embraced the comment that he and 'Murdaman' were 'killers' that would 'pop outside' (i.e., kill) for money." Opp. 9:4-6, 9:11-14. That argument rests on a meaning the government's own witness did not give. Asked what "pop out" means, Hester answered: "Like, come outside." 5RT 202:7. He added that "it could be multiple things. Pop out could be just come kick it." *Id.* at 202:15-16.

The opposition also faults Wilson for ignoring "the full context of the disputed statement." Opp. 8:10-11. Wilson submits that context with this reply: a time-stamped defense transcript of the video. Ex. L. At 00:02.42 to 00:02.46, it reads: "They talking about DeDe and Murda man, for sure that. Cool." *Id.*

Whether some reading of the comments could still support an inference of guilt is not the issue. The issue is whether the basis on which the government offered the video, and on which the Court admitted it, survives the comments. The Court answered that question: "the comments undermine the basis for the admission of the video." 12RT 98:1-2. When the Court asked what to do with a video that "has become considerably more problematic than it was on August 18th," the government's first option was to "withdraw its exhibit." 12RT 94:20-25.

**D. Declining To Replay the Video Does Not Defeat Prejudice.**

The opposition argues that the defense had the comments in time to cross-examine Hester and made "a tactical decision" not to. Opp. 12:14-17, 13:22-14:9. Using the comments meant replaying the video. Wilson moved before trial to exclude

the video. Def.'s Mot. to Exclude Other-Act Evid. at 9, ECF No. 488 (filed July 27, 2026, under seal); *see* Opp. 2:27-28. The Court admitted it on August 18. 12RT 93:2-6. The opposition notes that the defense did not object when the video was offered or played. Opp. 5:9-10, 5:24-27. It did not need to. Once the Court ruled, the objection was preserved without renewal. Fed. R. Evid. 103(b). Cross-examining Hester with the comments, or offering a transcript, would have meant playing the video for the jury a second time and directing the jury to the very line the defense maintained should never have reached it. The same concern governed after the Court struck the video. When the Court offered to tell the jury, the defense declined because an instruction "just exacerbates the prejudice." 13RT 4:1-4. An opportunity that can be used only by repeating the harm does not cure it.

Timely disclosure would have changed the defense's course. The materiality analysis for a mid-trial disclosure may consider whether, "had the evidence been timely disclosed, it might have altered the prosecution or defense strategy." *Cloud*, 102 F.4th at 980 (citing *United States v. Bundy*, 968 F.3d 1019, 1044 (9th Cir. 2020)). With the comments in hand before August 26, the defense would have renewed its objection before the jury saw the video, armed with the evidence that dispelled the government's sole basis for admitting it. The Court has since found exactly that: "the comments undermine the basis for the admission of the video." 12RT 98:1-2. Timely disclosure would have put that evidence before the Court before the jury watched the video, not nine days after.

The opposition adds that no witness testified to the meaning of the murder-man line and the government never argued it to the jury. Opp. 9:6-9, 13:27-14:1. The government did not need to. Its position at sidebar was that "the exhibit speaks for itself." 5RT 315:7, 316:8. It played the video for the jury in full. *Id.* at 200:22, 201:18. An exhibit offered because it speaks for itself does its work without a witness to explain it.

The opposition also invokes "the Court's prophylactic decision to strike Exhibit 164." Opp. 15:1-3. *Cloud* rejected the same argument. There, the government contended that any prejudice was avoided because the witness never testified. The Ninth Circuit declined to "create a perverse rule: that [the government] cannot be sanctioned . . . simply because the district court caught its misconduct too early." 102 F.4th at 981. Here the problem was caught late. The Court struck the video nine days after the jury watched it. 12RT 95:18-19. There was no way to unring the bell.

**E. Hester's Denials Contradict the Government's Own File, and the Government Left Them Uncorrected.**

The opposition asks the Court to "reaffirm its tentative denial of defendant's Napue claims," Opp. 18:3-4, arguing that Hester's answers were "[m]ere inconsistencies or honestly mistaken witness recollections," *id.* at 16:21-25 (quoting *United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014)). They were flat denials. Asked whether he told the FBI in May 2023 that he met Boonie Moe after landing in San Diego, Hester answered: "Never said that. If they wrote that down, that is on them. Ask them why they said that. I never said that." 7RT 133:10-17. The government's own May 2023 report says he did. Ex. K. Asked whether he had gone four years of cooperation and more than thirty meetings with the government without once mentioning that Wilson grabbed a Beretta from his hand, he did not say he forgot: "That's what you are saying . . . I don't care what them papers say, none of that -- I know what I said." 7RT 121:2-12; *see* 5RT 136:7-10. The first answer denies a statement the government's own report records. The second claims a prior account that nothing the government has produced contains. Both came from the government's central cooperating witness.

Hester described the grab on direct examination: Wilson took the Beretta from Hester's hand, pointed it at the window toward the men outside the Level Hotel, and said, "Boy, they easy. I can get out and fuck them up right now. Like they lacking, like." 5RT 306:14-307:8. On cross, Hester could not point to any prior occasion on

which he described it. Asked whether he mentioned it in the recorded May 2023 interview, he said he had never listened to that recording. The most he would say about his first meetings was that he "could have" raised it, and "I'm not 100 percent sure." 7RT 119:3-120:1. On redirect, AUSA Morse asked Hester about two FBI reports, one he described as from May 2025 and one from August 2026, to rehabilitate a different statement from that same night: that Wilson said they could get Quando Rondo right there. 7RT 150:15-152:1. The August 2026 report records Wilson's words that night. Yet neither report, and nothing else the government has produced, says that Wilson grabbed the Beretta from Hester's hand or pointed it at the window. Exs. I, J. The government had the file. It used the file on redirect. It did not use the file to correct Hester's account of the grab.

The opposition faults defense counsel for not calling the agents who wrote the reports. Opp. 18:13-22. But *Napue* places that duty on the prosecution, not the defense. It reaches the prosecutor who, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. The government needed no agent to tell it what its own reports said. It produced the May 2023 report, Ex. K, and its trial counsel used the 2025 and 2026 reports on redirect. 7RT 150:15-152:1.

On materiality, the opposition lists other evidence of guilt. Opp. 18:27-19:16. That is a sufficiency argument, and *Napue* asks a different question: whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotation marks omitted); *see* Opp. 17:6-8. The opposition's own list depends on the night Hester described. It cites evidence that Wilson and others "stalked Bowman from the night of August 18." Opp. 19:8-9. Bowman is Quando Rondo. 5RT 24:3-8. Hester's Level Hotel account is the government's witness account of what Wilson said and did that night, after the group arrived from the San Diego airport. 5RT 298:9-299:3. The government's own redirect shows how much it valued that account: it went to the FBI's reports to defend it. 7RT 150:15-152:1. Testimony the government

thought worth rehabilitating in front of the jury is testimony that could have affected the jury's judgment.

### F. If the Court Denies Rule 29 Relief, the Violations Warrant a New Trial on the Counts of Conviction.

The remedy Wilson's application originally requested, correcting testimony to the jury and instructing the jury to draw an adverse inference, is no longer available now that the trial has ended. The relief the verdict leaves open is a new trial on the counts of conviction.

District courts have broad discretion to shape a remedy for a *Brady* or *Napue* violation, tailored to the injury the defendant actually suffered. *United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018). In *Garrison*, the Ninth Circuit approved an adverse-inference instruction delivered to a sitting jury as an adequate remedy for an untimely *Brady* disclosure. *Id.* at 1065-66. In *Cloud*, the district court entered a *Brady* finding during trial and "cabined the remedy to the less drastic remedy of witness exclusion and a monetary sanction." 102 F.4th at 981. The Ninth Circuit held that approach "correct as a matter of law." *Id.* After a verdict, a material violation calls for a new trial. Under *Napue*, if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," then "the conviction must be set aside." *Hayes*, 399 F.3d at 984 (internal quotation marks omitted); *see Price*, 566 F.3d at 914 (reversing denial of motion for new trial where suppressed impeachment evidence was material). Wilson asks for that relief only on the counts of conviction, and only if the Court first denies Rule 29 relief. Because Wilson raised these violations during trial, before the verdict, the governing materiality analysis is the one for "withheld evidence discovered before or during trial." *Cloud*, 102 F.4th at 979.

The Court already told the parties when it would decide whether the government violated *Brady*. At the September 10, 2026 hearing, after addressing the jury's notes, the Court turned to this issue and explained what remained open:

> I believed that the likelihood of a Brady violation was remote enough, and given the posture of the case in any event, giving the requested instruction would not be appropriate. But it was left open whether there was a violation of Brady at all. And moreover, I did feel that the new state of affairs which Mr. Harbaugh was arguing made -- made it appropriate to strike the disputed exhibit, Exhibit 164, and the Government agreed. What we are left with, then, is to -- for me to make a formal determination on whether there was a Brady violation at all, which could arguably give rise to a mistrial.

15RT 14:1-11.

The Court then offered two paths: brief the issue immediately, or wait, because, as the Court explained, "if Mr. Wilson is acquitted, then of course it's all a moot point." 15RT 14:16-17. Wilson agreed to defer: "I agree with the Court, I think we should defer. I think this is probably post-trial briefing if we get there." 15RT 14:22-24. The Court agreed, and set the condition that has now been met: "if there is a conviction of Mr. Wilson on one or more counts, then we'll set out a briefing schedule." 15RT 15:1-3.

On September 11, 2026, the jury found Wilson guilty of Counts One through Three and not guilty of Counts Four and Five. 16RT 6:4-7:15. The Court's condition for deciding the *Brady* question, a conviction on one or more counts, is satisfied. Wilson's motion for a judgment of acquittal under Rule 29 remains pending as to Counts One through Three, and the Court should decide it first. If the Court denies that motion, Wilson asks the Court to find that the government violated *Brady* and *Napue* and to order a new trial on Counts One through Three. The Court recognized that a violation "could arguably give rise to a mistrial." 15RT 14:10-11. After a verdict, the corresponding relief is a new trial. That relief rests on what the government knew and disclosed about the video and Hester's testimony, not on the sufficiency of the evidence the jury heard.

/ / /

/ / /

/ / /

## III. CONCLUSION

For the foregoing reasons, Wilson respectfully requests that, if the Court denies his Rule 29 motion, it find that the government violated *Brady* and *Napue* and order a new trial on Counts One through Three.

Respectfully submitted,

Dated: October 21, 2026

*/s/ Craig A. Harbaugh*
CRAIG A. HARBAUGH
Attorney for Deandre Wilson

**SUPPLEMENTAL DECLARATION OF CRAIG A. HARBAUGH**

I, Craig A. Harbaugh, declare:

1. I am an attorney licensed to practice law in the State of California and admitted to practice before this Court. I am counsel of record for defendant Deandre Wilson. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify competently to them.

2. Exhibit L is a transcript of Government Exhibit 164 prepared by my paralegal, Christi McGowan, from the video of Government Exhibit 164 produced by the government.

3. Attached as Exhibit L is a true and correct copy of that transcript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 21, 2026, in Los Angeles, California.

*/s/ Craig A. Harbaugh*
CRAIG A. HARBAUGH

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for defendant Deandre Wilson, certifies that this brief contains 5,464 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 21, 2026

*/s/ Craig A. Harbaugh*
CRAIG A. HARBAUGH